**Salem**
LARRY D. JACKSON, COMMISSIONER
v.
W.
No. 0369-91-3
Decided May 5, 1992

394

COUNSEL

Thomas J. Czelusta, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Roger L. Chaffe, Senior Assistant Attorney General; Cheryl A. Wilkerson, Assistant Attorney General, on briefs), for appellant.

W. Bradford Stallard (Daniel H. Caldwell; Penn, Stuart, Eskridge & Jones, on brief), for appellee.

OPINION

KOONTZ, C.J.—The Commissioner of the Virginia Department of Social Services, Larry D. Jackson, appeals the circuit court's decision holding that the Department of Social Services' guide-

lines are unconstitutional.[1] The circuit court found that (1) the Commissioner did not have statutory authority to adopt the guidelines, (2) the guidelines are inconsistent with the statute, (3) the guidelines are unconstitutionally vague, and (4) W. was denied due process. We reverse.

This matter stems from a complaint lodged with the Washington County Department of Social Services (department) concerning the possible abuse of W.'s seven-year-old son. On December 20, 1988, Carol Anne Williams, a case worker with the department's protective services unit, contacted W. and advised him that he had been accused of child abuse. The following day, W. met with Williams and denied the charges. The department then conducted an investigation, which included an interview with W. By letter dated February 2, 1989, Williams notified W. that the complaint was determined to be "founded emotional abuse."[2] The letter also informed W. that he was the identified abuser, and that "[b]ased on the above disposition, your name and the names of your children will be placed in the Central Registry in Richmond and will remain there for ten (10) years past the child['s] eighteenth birthday." The letter advised W. of his right to appeal to the local director within thirty days of receipt of the notification.

W. exercised his right to appeal and requested an amendment of the record from "founded" to "unfounded." An informal conference was held on February 24, 1989. By written decision dated March 21, 1989, the local director sustained the department's disposition of "founded" and refused to amend the record.

On appeal to the Commissioner, a hearing was held on April 27, 1989. W. appeared personally and by counsel; Williams ap-

---

[1] The Virginia Department of Social Services (DSS), an executive department responsible to the Governor, is under the direction of the Commissioner of Social Services (Commissioner), the appellant in this matter. Code § 63.1-1.1. The State Board of Social Services (State Board) consists of nine members appointed by the Governor. Code § 63.1-14. Within each county or city in the Commonwealth there is a local department of social services (department). Code § 63.1-248.2(C). Each local department must establish a child-protective services unit. Code § 63.1-248.6(A). By authority of the Commissioner, the DSS created the Protective Services Manual, which contains the guidelines at issue here, for use by the local departments.

[2] After investigating a complaint, the department will render a disposition finding the complaint "founded," "reason to suspect," or "unfounded."

peared on behalf of the department. The record submitted to the hearing officer, acting on behalf of the Commissioner, included the following: the agency's investigative findings; a written report of Dr. Dennis Jurs; notes from an interview with Dr. Ralph Ramsdem, child psychologist; and a report by Thomas E. Schacht, PsyD., ABPP (Clinical). Dr. Jurs's report identified as inappropriate and embarrassing actions: forcing the child to take a bottle, vigorous scrubbing of the child's penile and anal areas during mutual showers, placing vaseline on the child's anal area, and cleaning the child's anal area after defecation. Dr. Jurs concluded that the continuation of this behavior "constitutes emotional abuse." Dr. Schacht, addressing this behavior by W., concluded that the child had a "significant emotional disturbance." Specifically, he found that "the caretaking practices targeted by the department's investigation are abnormal, humiliating, and psychologically harmful" to the child. Testimony was received from W. and Williams. W. admitted these parenting practices but maintained they were for "proper hygiene" or harmless "fantasy play." He testified that he had in fact taken showers with his son, checked his son's anus after defecation, helped dress his son, and permitted his son to have a bottle. W. denied that he forced the bottle upon his son. He admitted putting powder and vaseline on the child's rectum, but only when he was "chaffed." W.'s father was present but was not permitted to testify. However, W.'s counsel was allowed to proffer this testimony for the record.

On July 14, 1989, the hearing officer rendered his decision upholding the finding of the department:

UPON considering all relevant evidence and testimony, and based on applicable policy, it is apparent that appellant's behavior did in fact "inflict injury to the mental functioning of the child." The information as presented [provides] sufficient evidence based on the referenced policy to sustain the agency's "founded disposition of emotional abuse." It is determined that requiring a six-year-old child to use a bottle in spite of [protest], requiring that the six-year-old-child shower with appellant and the insistence of wiping and cleaning the six-year-old-child after he uses the bathroom, are clear and convincing [evidence] of "behaviors which are considered intimidating, humiliating . . . or excessively guilt-producing . . ." as specified in policy.

W. appealed the decision to the Circuit Court of Washington County. The circuit court ruled that (1) the Commissioner did not have statutory authority to adopt the guidelines, (2) the guidelines are inconsistent with the statute, (3) the guidelines are unconstitutionally vague, and (4) W.'s right to due process had been violated.

Code § 63.1-248.2(A) defines an abused or neglected child as any child less than eighteen years of age:

Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement, or impairment of bodily or mental functions; . . . .

The Commissioner established the following definition and guidelines for mental or emotional abuse:

*Mental Abuse*
(This type is often referred to as emotional abuse.)

Mental refers to emotional, intellectual, or psychological functioning. The parent or caretaker inflicts or threatens to inflict injury to the mental functioning of the child. The child may or does demonstrate significant mental difficulty which is caused or perpetuated by a pattern of identifiable behavior by the caretaker. In the absence of such evidence in a young child, it must be clear that the caregiver clearly exhibits an identifiable pattern of harmful behavior.

*Guidelines*
(1) A child's mental difficulty can only be considered to be the result of mental abuse when there is a described or a demonstrated relationship between caretaker behavior and the child's difficulty.

(2) Mental abuse may include, but is not limited to caretaker behavior, or threat of behavior, which is rejecting, intimidating, humiliating, ridiculing, chaotic, bizarre, violent, hostile, or excessively guilt-producing. . . .

(3) These caretaker behaviors may be obvious or subtle, explicit, stated, or implied.

(4) Evidence of mental difficulties, after organic causes have been ruled out, include, but are not limited to: poor school performance, poor peer relationships, feeding and sleeping problems, lethargy, enuresis, stuttering, runaway behavior, depression, and suicide threats.

Virginia Department of Social Services, Protective Services, Vol. VII, Section III, Chapter A at 7-8 (Protective Services Manual).

## I.

We first address the issue whether the Commissioner had the statutory authority to adopt these guidelines. The circuit court initially concluded that the guidelines were, in effect, regulations.[3] Based on this conclusion, the court then found that the guidelines were invalid because there is no statutory authority for the Commissioner to promulgate regulations. Indeed, under Code § 63.1-25, rule-making authority is vested in the State Board.[4] The Commissioner is charged with the responsibility of supervising the administration of the statute, Code § 63.1-4, and "enforc[ing] the rules and regulations adopted by the State Board," Code § 63.1-31. Under this statutory scheme, the General Assembly has granted the State Board, and not the Commissioner, the power to promulgate regulations. The Commissioner contends, however, that the guidelines are not regulations and were adopted pursuant to the Commissioner's responsibility to administer the statute. We agree.

"A 'rule' or 'regulation' is . . . 'any statement of general application, *having the force of law*, affecting the rights or conduct of any person, promulgated by an agency in accordance with the authority conferred on it by applicable basic laws.' Code §§ 9-6.14:4(F) and 9-6.16 (emphasis added)." *Bader v. Norfolk Redev. & Hous. Auth.*, 10 Va. App. 697, 701, 396 S.E.2d 141, 143

---

[3] The circuit court stated that "the commissioner has undertaken to promulgate, adopt, disseminate, implement and enforce a very comprehensive and complex set of regulations concerning the handling of child-protective services."

[4] Code § 63.1-25 provides: "The State Board shall make such rules and regulations, not in conflict with this title, as may be necessary or desirable to carry out the true purpose and intent of this title." The terms "rule" and "regulation" are used interchangeably.

(1990). DSS's Protective Services Manual provides that "[t]he guidelines are intended to be used as tools for the worker in investigating situations of abuse or neglect." In other words, the guidelines merely assist the case worker in interpreting the statute. Used in conjunction with the statute, the guidelines help the case worker identify abusive conduct. The guidelines do not purport to be a substitute for the statute. Because they are designed merely to provide assistance to local departments in the administration of the statute, they do not have the force of law. Moreover, the guidelines do not affect any right of W. He is not subject to criminal or civil penalty as a result of having a complaint against him deemed "founded."[5] Thus, the guidelines are not regulations.

The Commissioner's adoption of guidelines interpreting the statute was within his statutory authority. Although the General Assembly did not grant the Commissioner the authority to enact regulations, it did authorize him to "supervise the administration of the provisions of this title and . . . [to] see that all laws pertaining to the [DSS] are carried out to their true intent and spirit." Code § 63.1-4. The Commissioner has exercised his authority under § 63.1-4 by establishing guidelines to be applied by the local departments of social services throughout the Commonwealth in interpreting the definitions of abuse and neglect provided by statute. Consequently, the guidelines were adopted pursuant to the Commissioner's authority to administer the statute and give effect to its true intent and spirit.

We have held that a state agency, "[i]n addition to its statutorily granted powers . . . has incidental powers which are reasonably implied as a necessary incident to its expressly granted powers for accomplishing [its] purposes." *Bader*, 10 Va. App. at 702, 396 S.E.2d at 144. In order to carry out its purpose, an agency may adopt an " 'interpretative rule' without the binding force of law."[6] *Id.* (upholding Workers' Compensation Commis-

---

[5] For a more comprehensive discussion of this issue, see section IV, *infra.*

[6] "The most comprehensive statement of the role of interpretative [rules] . . . is found in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), where the Court said: '[W]hile not controlling upon the courts by reason of their authority, [interpretative rules] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' "

sion's use of a Hearing Determination Chart because the Chart is a guideline that assists in determining levels of compensable hearing loss). Consistent with the reasoning of *Bader*, the guidelines at issue here are properly viewed as interpretative rules adopted in order to carry out the agency's purpose of implementing the Commonwealth's policy of protecting children from abuse and neglect. That policy is expressed in Code § 63.1-248.1, which provides:

> The General Assembly declares that it is the policy of this Commonwealth to require reports of suspected child abuse and neglect for the purpose of identifying children who are being abused or neglected, of assuring that protective services will be made available to an abused or neglected child in order to protect such a child and his siblings and to prevent further abuse or neglect, and of preserving the family life of the parents and children, where possible, by enhancing parental capacity for adequate child care.

■ The circuit court "fail[ed] to see the authority for and question[ed] the necessity of the Commissioner's adoption of his own set of definitions of child abuse and neglect when the ones supplied by the General Assembly appear to be perfectly adequate." A court may not merely substitute its judgment for that of an administrative agency. *See Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 244, 369 S.E.2d 1, 8 (1988)(citation omitted). The Commissioner has been charged with the responsibility of carrying out the Commonwealth's policy of protecting children from abuse and neglect. *See* Code § 63.1-31. With regard to the "necessity" of the quidelines in question, it is inappropriate for a court to second-guess the manner in which an agency responds to its responsibility of carrying out the Commonwealth's policy when those means are not prohibited.

## II.

■ Having determined that the Commissioner did not exceed his statutory authority in adopting interpretative guidelines for the statute, we next address the issue of whether the guidelines are inconsistent with the statute. On review, "the interpretation which

*Bader*, 10 Va. App. at 702-03, 396 S.E.2d at 144 (quoting *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141-42 (1976)).

an administrative agency gives its [law] must be accorded great deference." *Virginia Real Estate Bd. v. Clay*, 9 Va. App. 152, 159, 384 S.E.2d 622, 626 (1989), *appeal dismissed*, 398 S.E.2d 78 (Va. 1990). "The trial courts may reverse the administrative agency's interpretation only if the agency's construction of its [law] is arbitrary or capricious or fails to fulfill the agency's purpose as defined by its basic law." *Id.* at 161, 384 S.E.2d at 627 (citing *Johnston-Willis*, 6 Va. App. at 246, 369 S.E.2d at 9).

The circuit court found that the guidelines were inconsistent with the statute because they permitted a finding of mental abuse based solely upon the behavior of the parent or caretaker, even in the absence of any mental injury to the child. In this case, however, no inconsistency exists between the guidelines and the statute as applied to the facts and conclusions reached by the hearing officer.

W. admitted to the parenting behavior which Dr. Jurs and Dr. Schacht concluded to be inappropriate, embarrassing, abnormal, humiliating and psychologically harmful to the child. While these professionals concluded that W. may not have intended to inflict a mental injury upon his child, Dr. Jurs concluded that the continuation of W.'s behavior "constitutes emotional abuse" and Dr. Schacht concluded that the child had a "significant emotional disturbance." The hearing officer found that W.'s behavior "did in fact 'inflict injury to the mental functioning of the child.' " Thus, the hearing officer's determination of "founded disposition of emotional abuse" was not based solely upon W.'s parenting behavior without an injury to the child, but, rather was based upon W.'s parenting behavior and an injury to the child.

Moreover, when read in its entirety, the statutory definition of abuse contained in Code § 63.1-248.2(A)(1) contemplates behavior of a parent which in fact inflicts a mental injury upon a child or such behavior which "creates a substantial risk of . . . impairment of . . . mental functions" of a child. The guidelines are consistent with the statutory definition of abuse and require either a determination of an actual mental injury or "an identifiable pattern of harmful behavior" by the parent that "threatens to inflict injury to the mental functioning of the child." In *Jenkins v. Winchester Department of Social Services*, 12 Va. App. 1178, 409 S.E.2d 16 (1991), we held "that the statutory definitions of an abused or neglected child do not require proof of actual harm

or impairment having been experienced by the child." *Id.* at 1183, 409 S.E.2d at 19. We reaffirm that holding in this case. The Commonwealth's policy is to protect abused children and to prevent further abuse of those children. This policy would be meaningless if a child must suffer an actual injury from the behavior of his or her parent before receiving the Commonwealth's protection. Neither the statute nor the guidelines impose such trauma upon a child.

In sum, we reject the circuit court's conclusion that the department's guidelines governing the definition of emotional or mental abuse "overreach that which is contemplated by the statute." The guidelines are not inconsistent with the language and intent of Code § 63.1-248.1 to -248.17. We find that the guidelines "fulfill the agency's purpose" by assisting the department in administering the Act and are not arbitrary or capricious. *See Clay*, 9 Va. App. at 161, 384 S.E.2d at 627.

### III.

■ We turn now to W.'s contentions that the guidelines are unconstitutionally vague because (1) they do not provide fair notice of the conduct proscribed, and (2) they confer upon the Commissioner unlimited and unfettered discretion to determine if the proscribed behavior qualifies as child abuse.[7] As a preliminary matter, we note that W. may only challenge the guidelines as they apply to him and not as they may apply to other persons in other situations. *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also Coleman v. City of Richmond*, 5 Va. App. 459, 463, 364 S.E.2d 239, 241-42, *reh'g denied*, 6 Va. App. 296, 368 S.E.2d 298 (1988). In *Maynard*, the United States Supreme Court held that "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." 486 U.S. at 361. Because W. does not allege any interference with the exercise of his First Amendment rights, we may only consider his void for vagueness argument as it relates to him. Thus, W.'s claim that "the vast majority of parents residing in the Commonwealth could be deemed guilty of child abuse" under the guidelines is beyond the scope of our review here.

---

[7] W. is challenging the vagueness of the department's guidelines and not the statute, Code § 63.1-248.2. We assume, without deciding, that the void for vagueness doctrine extends to administrative interpretative guidelines lacking the force and effect of law.

■ Essentially, the vagueness doctrine demands that laws be drawn with a degree of precision and clarity. "A statute which does not clearly delineate what is prohibited conduct may be void for vagueness." *Coleman*, 5 Va. App. at 466, 364 S.E.2d at 243 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Due process requires " 'that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " *Id.* (quoting *Grayned*, 408. U.S. at 108). The doctrine of constitutional vagueness has a secondary but equally important goal of providing " 'explicit standards for those who apply them' " in order to prevent arbitrary and discriminatory enforcement. *Id.* Simply stated, these two requirements ensure "fair notice" and "fair enforcement." *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

■ The standard for measuring vagueness is not rigid. "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Id.* "The [United States Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99 (footnote omitted). Furthermore, if a "law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499.

Here, the "enactment" under scrutiny is a set of interpretative guidelines lacking the force and effect of law.[8] Moreover, W. does not face any penalty, civil or criminal, as a result of having his conduct fall within the definition of "mental abuse" under the guidelines. Nor does W. argue that the guidelines reach protected First Amendment activity.[9] Thus, in terms of precision and clarity, the greatest level of tolerance should be afforded to the guidelines.

W. claims that the guidelines are so vague that they fail to provide fair notice that his parenting practices would constitute child

---

[8] *See* discussion, section I, *supra.*

[9] W. claims that because the relationship between parent and child is constitutionally protected, the guidelines must be viewed under strict scrutiny. We do not dispute that the parent-child relationship is constitutionally protected. However, that relationship is not protected because it involves the right of free speech under the First Amendment. Moreover, the guidelines do not interfere with the relationship between parent and child. Any change in parental rights must be adjudicated in a court proceeding.

abuse. In particular, W. challenges the following language defining mental abuse:

> (2) Mental abuse may include, but is not limited to caretaker behavior, or threat of behavior, which is rejecting, intimidating, humiliating, ridiculing, chaotic, bizarre, violent, hostile, or excessively guilt-producing . . . .

W. argues that the terms "rejecting, intimidating, humiliating, ridiculing, chaotic, bizarre, violent, hostile, or excessively guilt-producing" are so ambiguous that he must guess at their meaning. We disagree. First, we are reminded that the guidelines interpret the statutory term "mental injury" and are simply intended to assist the worker in identifying abuse and neglect. These terms describe particularized conduct which, when measured by common practice and understanding, may be deemed abusive. Moreover, the guidelines state that "[m]ental abuse *may include*, but is not limited to" behavior that meets these terms. This language indicates that these types of behavior *may*, but not necessarily do, constitute mental abuse. For these reasons, we find that these terms are not so ambiguous as to require W. to guess at their meaning.

Courts from other jurisdictions have upheld similar language against void for vagueness challenges. *See People v. D.A.K.*, 596 P.2d 747, 750-51 (Colo.), *appeal dismissed*, 444 U.S. 987 (1979); *In re Hanks*, 553 A.2d 1171, 1175-76 (Del. 1989); *Chandler v. Cochran*, 275 S.E.2d 23, 26-27 (Ga.), *cert. denied*, 454 U.S. 872 (1981); *In re Gentry*, 369 N.W.2d 889, 893 (Mich. Ct. App. 1985); *State ex rel. Health & Social Servs. Dep't v. Natural Father*, 598 P.2d 1182, 1185 (N.M. Ct. App. 1979); *In re J.Z.*, 190 N.W.2d 27, 35-36 (N.D. 1971); *In re D.T.*, 237 N.W.2d 166, 169 (S.D. 1975). In *In re Gentry*, for instance, the court found that the term "mental deficiency or mental illness," in a statute providing for the termination of parental rights, was not so vague as to offend the constitution. 369 N.W.2d at 893-96. In these cases, the language under attack was statutory, and the penalty for having one's conduct fall within the statutory language was the termination of parental rights. Thus, in these cases the courts were less tolerant of any possible vagueness. Despite the severe consequences, the courts still found the statutory language sufficiently definite to put the parent on notice of the proscribed conduct.

██ W. also contends that reasonable men may disagree whether certain behavior is, for example, "excessively guilt-producing." However, the fact that there may be room for interpretation does not necessarily render the guidelines impermissibly vague. "The potential for such differences of opinion [concerning the precise meaning of a statute] cannot be enough to render a statute void for vagueness." *Planned Parenthood v. Arizona*, 718 F.2d 938, 948 (9th Cir. 1983).

As applied to the facts of this case, the guidelines give W. "fair notice" of the conduct deemed mental abuse and are reasonably clear in their application to W. The nature of the enactment and the lack of any penalty or infringement on First Amendment activity require that we view with great tolerance the precision with which the guidelines are drawn. In light of this standard, we find that the guidelines are not so vague as to offend the Fourteenth Amendment.[10]

## IV.

Finally, we turn to W.'s contention that he was denied due process. The circuit court held that the proceedings before the department and the Commissioner failed to comport with due process. Specifically, it found that W. was not permitted to have his father testify, was not permitted to subpoena witnesses on his behalf, was not given the names of or permitted to cross-examine individuals who gave testimony to the case worker, and was prevented from facing his accusers.

██ The Fourteenth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law.[11] "Procedural due process rules are meant to protect persons not from the deprivation, but

---

[10] Although the circuit court also found that the guidelines were "exceedingly broad," there is no constitutional overbreadth challenge to the guidelines. It is clear that "the overbreadth doctrine is applicable primarily in the First Amendment area." 16A Am. Jur. 2d *Constitutional Law* § 460 (1979). An ordinance is overbroad if it deters constitutionally protected conduct." *Perkins v. Commonwealth*, 12 Va. App. 7, 12, 402 S.E.2d 229, 232 (1991). W. does not argue that the guidelines infringed upon his exercise of protected First Amendment activity. Therefore, a constitutional overbreath analysis of the guidelines is not necessary here.

[11] W. argues that the procedures denied him due process under the Fourteenth Amendment of the United States Constitution and Article I, Section 11 of the Virginia Constitution. The state and federal due process clauses "have almost exact similarity in

from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). Due process analysis involves a two-part inquiry. *See Klimko v. Virginia Employment Comm'n*, 216 Va. 750, 754, 222 S.E.2d 559, 563, *cert. denied*, 429 U.S. 849 (1976). First, there must be a deprivation of a liberty or property interest. *See id.* at 754, 222 S.E.2d at 564. Then, " '[o]nce it is determined that due process applies, the question remains what process is due.' " *Id.* at 756, 222 S.E.2d at 565 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

■ The Commissioner contends that we do not need to reach the first prong of the test because due process protections do not apply to the child protective services proceedings at issue here. Relying on *Hannah v. Larche*, 363 U.S. 420 (1960), the Commissioner argues that due process does not apply to administrative proceedings that are investigatory in nature and do not involve the adjudication of any right or interest. The United States Supreme Court has held that when the investigative powers of an agency are utilized, due process considerations do not attach. *Hannah*, 363 U.S. at 442.

> [W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.

*Id.; see also Georator Corp. v. EEOC*, 592 F.2d 765, 768-69 (4th Cir. 1979) (Equal Employment Opportunity Commission determination of reasonable cause "carries no determinate consequences" and "is without legal effect in and of itself"). Thus, the Due Process Clause is not implicated where an administrative agency acts solely in an investigative, as compared to an adjudicative, role.

---

language" and, therefore, our analysis of the due process issue applies equally to both state and federal law. *See Morris v. City of Danville*, 579 F. Supp. 900, 901 n.1 (W.D. Va. 1984).

In *Hannah*, the Court held that witnesses testifying in proceedings before the Federal Commission on Civil Rights (Commission) were not entitled to procedural due process. 363 U.S. at 449. There, witnesses called before the Commission in connection with a hearing concerning the discriminatory denial of voting rights challenged the validity of the Commission's procedural rules. *Id.* at 421-22. In particular, they argued that they were denied the right to know the charges being investigated or the identity of the persons filing the charges, and the right to cross-examine other witnesses. *Id.* at 422. Upon examining the duties of the Commission, the Court described the Commission as an administrative body charged with investigating complaints of civil rights violations and reporting those findings to the President and Congress. *Id.* at 440-41. The Court held that the Commission's "function is purely investigative and fact-finding" and not adjudicative. *Id.* at 441.

> It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action.

*Id.* Thus, persons coming before the Commission were not entitled to the due process protections "normally associated only with adjudicatory proceedings." *Id.* at 442.

 Here, the Commissioner contends that the department in its protective services role serves a "purely investigative and fact-finding function." In order to address this contention, we must examine the powers and duties of the department with regard to the child protective services hearing.[12] Generally, the department has

---

[12] There are three different steps in the administrative process. First, after a complaint is filed, a representative of the department will investigate the complaint and make an initial determination of whether there is clear and convincing proof of abuse. If a complaint is deemed "founded" or "reason to suspect," the alleged abuser may appeal the determination to the local director of the department. In this first appeal proceeding, called the "local conference," the local director must determine whether the record should be

the following duties: to investigate complaints; determine whether the complaint is "founded," "reason to suspect," or "unfounded"; place the name of a person with a "founded" complaint in the Central Registry; report its findings when required; make recommendations and arrange for services based on findings; and foster community-based outreach and educational programs. Code § 63.1-248.6. The hearing officer lacks the power to issue subpoenas or administer an oath. The officer has no authority to impose civil or criminal penalties or render a decision adjudging the party "guilty" or "not guilty." *D'Alessio v. Lukhard*, 5 Va. App. 404, 408, 363 S.E.2d 715, 717-18 (1988)(the administrative proceeding does not "determine . . . guilt or innocence"). In fact, if civil or criminal rights are to be adjudicated, a court must intervene upon appropriate process. Code § 63.1-248.6(D)(4),(5). The only direct consequence of the proceeding is that a party's name is placed in the Central Registry. *See Lukhard*, 5 Va. App. at 408, 363 S.E.2d at 717; *see also* Code § 63.1-248.6:1.

Clearly, the department's primary purpose is to investigate complaints of child abuse and, when necessary, provide appropriate services for the child or family. However, to perform its function, the department issues a binding determination that a party did abuse a child. While such a determination does not in and of itself result in civil or criminal penalties, we agree with the trial court's observation that "in today's society there is no more deplorable badge of infamy a person can wear than that of being a child abuser." We recognize that it is the power to make binding decisions which distinguishes adjudication from investigation for purposes of due process analysis. *Hannah*, 363 U.S. at 442. However, because of the nature of the determination made by the department in child abuse cases, we decline to rest our decision *solely* on the basis that the department, in its protective service role, serves a "purely investigative" function. Rather, to the extent that the department's determination of "founded, emotional abuse" may be considered an adjudication, we are required to further review W.'s claim of a denial of due process.

---

amended. Finally, in the last stage of the administrative appeal process, the alleged abuser may request an administrative hearing by the Commissioner. Here, the alleged abuser must prove by a preponderance of the evidence that the record should be amended because it contains information which is irrelevant or inaccurate. Protective Services Manual, Vol. VII, Section III, Chapter A at 56-60. W. is challenging the procedures in the last step in the administrative appeal process.

Having declined to rest our decision on a determination that the child protective services proceedings are purely investigatory, we must decide whether W. has been deprived of liberty or property under the first prong of the due process test. W. argues that the proceedings resulted in a "deprivation" as contemplated by the Due Process Clause. W. contends that the "founded" disposition will (1) damage his career, (2) expose him to criminal prosecution, (3) prevent him from being a foster or adoptive parent or from owning, operating or working in a nursing home or child care center, and (4) damage his reputation. However, we find no "deprivation" of any right protected by the Due Process Clause.

■ With regard to these claims, we again find the Supreme Court's reasoning in *Hannah* instructive. There, the Court refused to rule that due process was required even though the "proceedings might irreparably harm those being investigated by subjecting them to public opprobrium and scorn, the distinct likelihood of losing their jobs, and the possibility of criminal prosecutions." 363 U.S. at 443. The Court found that such possible losses were speculative at best:

> That any of these consequences will result is purely conjectural. There is nothing in the record to indicate that such will be the case . . . . However, even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function.

*Id.* (footnote omitted).

First, W. contends that the danger of future disclosure of the "founded" disposition would impact his dentistry practice and his livelihood.[13] However, the record lacks evidence of any damage to W.'s practice. Moreover, the information in the Central Registry is confidential and, therefore, no reasonable likelihood exits that this information would become available to W.'s patients.[14] For

---

[13] The circuit court speculated that because W. is one of the few "practitioners who has been willing to accept welfare patients in the past for which he is paid with public funds, it is reasonable to assume that such referrals will soon end if they have not already."

[14] In *Whalen v. Roe*, 429 U.S. 589 (1977), the United States Supreme Court found no violation of any right or liberty protected by the Fourteenth Amendment in the state's computerized storage of personal, medical information that was "potentially embarrassing

this reason, speculation concerning some possible damage to W.'s livelihood is without foundation.

Likewise, W.'s claim that the administrative proceedings may serve as a predicate for criminal prosecution has no merit. Even if W. were later subject to criminal penalty, it would not be the result of the administrative appeal proceeding. The department has no authority to bring criminal charges. Rather, the Commonwealth must bring criminal charges. Furthermore, at the proceedings below, W. was not adjudged "guilty" of any offense. To the contrary, it was determined that the complaint alleging child abuse was "founded." At a criminal proceeding, the Commonwealth would be required to prove W. guilty of child abuse beyond a reasonable doubt. However, in the administrative process, only clear and convincing proof of abuse is required before the complaint will be labeled "founded." Protective Services Manual, Vol. VII, Section III, Chapter A at 17.[15]

W. further argues that the "founded" disposition precludes him from being a foster or adoptive parent or from owning, operating or working in a nursing home or child care center.[16] For this reason, W. concludes that he has been deprived of rights enjoyed by other Virginia citizens. We disagree. Although a "founded" disposition could possibly foreclose W.'s chances for engaging in these activities, no rule exists that a "founded" disposition of child abuse automatically disqualifies an applicant. Furthermore, W. does not argue that he has been denied such a "right" by virtue of having a complaint against him deemed "founded." Rather, he posits that sometime in the future he may conceivably be deprived

---

or harmful if disclosed" when accompanying law also required measures to protect against unwarranted public disclosure. Here, the statute expressly provides for the confidentiality of all records or files compiled during the investigation, Code § 63.1-248.7(J), and the data stored in the Computerized Central Registry, Code § 63.1-248.8. Therefore, information concerning W.'s abusive conduct is not generally available to the public.

[15] W. also argues that under the principles of *res judicata* and collateral estoppel, the administrative proceedings can be used against him in a later judicial proceeding. While it is not necessary to our holding to decide whether the department's proceedings would be given preclusive effect in a subsequent judicial proceeding, we stress that we have found the department's procedures do not serve a purely investigative function only so that we can address W.'s liberty and due process claims in this case.

[16] The Commissioner is involved in the investigation and licensing of persons seeking to be foster or adoptive parents, or seeking to own, operate or work in a child care center, nursing home or similar institutions. Code §§ 63.1-172 *et seq.*, 63.1-195 *et seq.*, 63.1-220 *et seq.*

of the opportunity. Consequently, W. has not identified a "deprivation" recognizable under the Due Process Clause.

 Finally, W. contends that because he has been "branded a child abuser," his good name and reputation are implicated. W. maintains that his interest in his reputation is a valuable property right that may not be impaired without due process of law. However, a person's reputation alone is not a liberty or property interest and thus is not entitled to due process protection. *Paul v. Davis*, 424 U.S. 693, 712 (1976)(being branded a shoplifter, standing alone, does not implicate the Due Process Clause). A change in legal status or loss of a tangible interest must accompany the defamation in order to invoke the Due Process Clause. *Id.; see also Wisconsin v. Constantineau*, 400 U.S. 433 (1971) (due process implicated where governmental action resulted in damage to reputation and denial of right granted under state law to purchase liquor). The "founded" disposition did not affect W.'s parental rights. Any change in his parental rights must be adjudicated in a judicial proceeding. Because W. has not identified any change in his legal status or any tangible loss, the protections of the Due Process Clause do not come into play.

W. does no more than speculate about possible damage to his reputation, employment and future chance of engaging in activities licensed and investigated by the Commissioner. Although W. could speculate about numerous possible adverse consequences, this is not sufficient to trigger due process. Absent some tangible, identifiable loss, W. cannot invoke the protections of the Due Process Clause. Thus, we find that the "founded" disposition has neither altered W.'s legal status nor deprived him of some right enjoyed by other citizens.

 In reaching our final decision in this case, we note that even if W. were entitled to due process, he has been given all the process he is due. Due process is a flexible concept, and the procedural protections required in a certain instance vary according to the circumstances of the particular case. *Klimko*, 216 Va. at 760, 222 S.E.2d at 568; *see also Hannah*, 363 U.S. at 442; *Occoquan Land Dev. Corp. v. Cooper*, 239 Va. 363, 368, 389 S.E.2d 464, 467 (1990). In order to determine what process is due, three considerations must be balanced: (1) the private interest at stake; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards; and (3) the Commonwealth's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Dixon v. Love*, 431 U.S. 105, 112-13 (1977) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Under this balancing test, we weigh the competing interests of the government and the private party and consider the value and cost of requiring additional procedures. First, as discussed, W. cannot identify any interest, recognized by the Due Process Clause, that will be affected by the proceedings. On the other hand, the government has an important interest in preventing child abuse and neglect. Considering the value of additional procedures in reducing the risk of an erroneous deprivation, we are mindful that the department's initial determination was subject to two appeal proceedings. W. was given notice and an opportunity to be heard. Moreover, the burden on the Commonwealth, in terms of administrative efficiency and financial cost, of requiring additional procedural requirements is significant. As a practical matter, permitting witnesses appearing before the department to enjoy the rights that typically pertain in adjudicatory proceedings would have adverse identifiable consequences. The primary function of the department is to investigate complaints of child abuse and neglect. The Supreme Court has warned that "the investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings." *Hannah*, 363 U.S. at 443. Indeed, requiring the department to provide "the full panoply" of procedures normally associated with an adjudication would severely undermine the fact-finding duties of the agency. *See id.* at 443. Consequently, the challenged procedures are constitutionally adequate even were it to be assumed that W. has a protected liberty or property interest under the Due Process Clause.

The General Assembly has left no doubt that child abuse and neglect is a serious concern, and that the policy of the Commonwealth is to encourage reports of child abuse and investigation of those reports and thus to identify and protect children at risk of harm at the earliest possible opportunity. *See* Code § 63.1-248.1. We decline to rule that the procedures adopted by the agency to implement this policy are unconstitutional.

In sum, we find that (1) the Commissioner had statutory authority to adopt the guidelines, (2) the guidelines are not inconsis-

tent with the statute, (3) the guidelines are not unconstitutionally vague, and (4) W. was not denied due process. For these reasons, we reverse the decision of the circuit court.

*Reversed.*

Coleman, J., and Elder, J., concurred.