### Richmond

STATE BOARD OF HEALTH OF THE
COMMONWEALTH OF VIRGINIA, ET AL.

V.

JOSEPH E. GODFREY, ET AL.

April 30, 1982.

Record No. 790956.

Present: All the Justices.

*R. Leonard Vance, Assistant Attorney General (Marshall Coleman, Attorney General; James E. Ryan, Jr., Deputy Attorney General,* on briefs), for appellants.

*B. L. Dunford-Jackson (B. Waugh Crigler; Davies, Crigler, Barrell & Will, P.C.,* on brief), for appellees.

COCHRAN, J., delivered the opinion of the Court.

In this appeal, we review the ruling of the trial court in a proceeding under the Administrative Process Act (APA), Code §§ 9-6.14:1, *et seq.,* initiated by applicants to obtain a permit for installation of a septic tank.

On August 26, 1977, Joseph E. Godfrey and Adlyne Godfrey, husband and wife, filed a bill of complaint against the Commonwealth of Virginia, Department of Health, and James B. Kenley, M.D., State Health Commissioner. As subsequently amended, the bill named as defendants, in addition to the Department of Health and the Commissioner, the other members of the State Board of

Health.[1] Complainants alleged that the action of the defendants (collectively, the Board or the agency), in sustaining the denial by the Culpeper County Health Department of a permit to install a septic tank and drainfield on certain land of the Godfreys aggregating approximately forty acres, was arbitrary, capricious, and unreasonable, and denied them due process. The amended bill sought to have the trial court order the issuance of the permit.

The Board moved the trial court to restrict its review to the record before the agency when the decision to deny the permit was sustained and to consider only the two sites for which applications had been formally denied by the agency. Denying the motion, the court ruled that it would permit the parties to introduce the testimony of witnesses and that it would receive evidence concerning the installation of a septic tank and drainfield at any location on the forty-acre tract.

At trial, two witnesses testified for the Godfreys, George Bernard Miller, who had contracted to purchase the forty-acre tract, and Joseph Godfrey himself. The Board relied solely on the agency record. By final decree entered March 28, 1979, the trial court ruled that the Board was "arbitrary, capricious and unreasonable" in denying the permit for installation of a septic tank, and ordered the Board forthwith to issue the necessary permit.

On appeal, the Board not only challenges the ruling of the trial court on the merits but also contends that the court erred in admitting evidence outside the agency record. In oral argument, the Board abandoned an additional contention that the court erred in hearing the case before the Godfreys had exhausted their administrative remedies.

The agency record shows that Miller first applied for a septic-system permit in December of 1976. Stanley Borders, employed by the Board as Sanitarian for the Culpeper County Health Department, rejected the application because of "very slow absorption rate in plastic type clay of upper horizon, evidence of seasonal water table at about 30 [inches] and restriction of water flow due to clay flows in lower horizon." On December 17, 1976, W. W. Burke, the Sanitation Supervisor for Culpeper County, and H. V. Bodkin, Regional Sanitarian for the area that included Culpeper and other counties, filed soil evaluation worksheets supporting

[1] Kenneth M. Haggerty, D.D.S., Fletcher J. Wright, Jr., M.D., John H. Van Hoy, O.D., Wm. R. Hill, M.D., A. Gibson Howell, J. Curtis Nottingham, Clarence W. Taylor, Jr., M.D., Brig. Gen. James M. Morgan, Jr., and Fostine G. Riddick, R. N.

Borders' rejection of the application. Burke and Bodkin reported a seasonal water table at twenty-four to thirty inches and Bodkin also listed as a problem the poor absorption rate in the "Blackjack" soil.[2]

Miller employed R. B. Thomas, Jr., Ltd., a Manassas civil engineering firm, to evaluate soil conditions on the Godfrey property. Thomas reported on March 3, 1977, that on two proposed sites the topsoil and subsoil were unsuitable but that a two to three and one-half foot layer of sandy soil underlying the clay upper horizon would support a drainfield. Thomas recommended installation of the drainfield at a depth of seven feet below the surface of the ground. Plats and site development plans were attached to the report.

Miller and Godfrey applied for a permit for either of the sites recommended in the Thomas report; Borders rejected the application for essentially the same reasons that he had previously stated in disapproving Miller's 1976 application. His superiors, Burke and Bodkin, again filed soil evaluation worksheets that listed as problems a seasonal water table, limited depth of "weathered rock" (the sandy material reported in the Thomas evaluation), variable depths to weathered rock, predominance of plastic clay, and hard rock at shallow depths.

On April 27, 1977, at the Board's request, W. J. Meyer, a soil scientist at Virginia Polytechnic Institute and State University, conducted a soil investigation of the two Thomas sites. Based on his examination of nine site borings, Meyer reported:

> Problems with the site include: variability in depth to weathered parent material, clay flows in part of parent material, plastic clay subsoils with expected slow or nil rates of absorption, a seasonal water table in horizon with gray above plastic clay, and limited area of deeply weathered diabase not restricted by hard rock.

At Godfrey's request an informal administrative appeal was conducted by the Culpeper County Health Department on May 10, 1977. Dr. R. S. LeGarde, Director, informed Godfrey, Miller, and their attorneys, by letter that after consideration of the two

---

[2] "Blackjack" soils were defined in the record by a United States Department of Agriculture District Conservationist as seven specified soil types found in Culpeper County with "severe limitations for use as septic tank absorption fields due to slow percolation."

Thomas sites and the site proposed by Miller in 1976, the Department confirmed the rejections. Dr. LeGarde pointed out that Thomas had recommended installation of the drainfield at a depth of seven feet, whereas one of the borings upon which Borders, Burke, and Meyer based their evaluation showed hard rock at fifty-six inches, and the others at forty-two inches. Godfrey next requested a formal hearing on the applications, as authorized by Code § 9-6.14:12.

Miller employed T. A. Houston and Associates, Ltd., environmental geologists, to determine the feasibility of installing a conventional septic drainfield on the Godfrey land. Houston's report, dated May 31, 1977, recommended use of "special design considerations," including a 10,000 square-foot drainfield area, a sewage lift pump, deep drainfield trenching, surface grading, installation of tile drains at a depth of seventy-two inches, and on-site Health Department inspection during construction. Houston's site 1, the preferred location of two that he evaluated, included the second Thomas site previously rejected and some additional area. In view of the partial identity of sites, Borders refused Miller's request to examine the Houston sites until the pending appeal was concluded.

The formal hearing was conducted on June 29, 1977, attended by Miller, the attorneys for Miller and Godfrey, and by Houston, Borders, Burke, Bodkin, Meyer, and Dr. LeGarde. The agency record included a transcript of the testimony as well as the Thomas and Houston reports previously filed.

Houston was the applicant's primary witness. He amplified his soil analysis and recommendation for a special design system. He agreed that a conventional septic system would not function on his proposed site 1, but he thought his specially designed system would be satisfactory. In making a seismic survey, he had observed no seasonal water table in the deeper, weathered material, although he found such a table in higher strata, and he concluded that the "hard rock," represented to be a problem, consisted of weathered concentric boulders that could be removed by a backhoe. Since the site was sloped, there would be adequate surface drainage to make the proposed system acceptable.

Burke said that Houston's proposal was not novel to the area, that the same kind of system had been tried within the past ten to fifteen years. According to Burke and Borders, four out of twelve similar systems in the same type soil within two miles of the God-

frey property had failed within the preceding nine years. Burke maintained that to protect the high water table from pollutants it was necessary to refuse the permit.

Meyer had not examined Houston site 1, although he had visited the Thomas site included therein. He expressed concern that the weathered sandy soil, upon which the viability of the Houston proposal depended, would not extend the full length of a drain line or drain slope, but would be found to lie in pockets that would fill up. In view of Houston's testimony, however, Meyer suggested that the Commissioner consider having the landowner designate the drainfield lines and make test borings along the lines to determine whether there was continuity of the permeable weathered material.

By letter dated July 28, 1977, the Commissioner denied the applications for the two Thomas sites. He based his denial upon the reports of poor percolation rate, poor subsurface drainage, and a water table, and upon Meyer's testimony that soil of the type in question varies in depth to solid rock, and that the varying depth produces pockets.

Nevertheless, the Commissioner, noting that Houston had suggested that other locations on the property, not evaluated by the local Health Department, might support a septic system, was of opinion that this additional information should be assessed. He further stated that the local Health Department "will consider issuing a septic tank permit" if the following minimum soil conditions "are demonstrated to be present in the exact location" proposed for the drainfield:

a) Thickness of at least three feet of weathered diabase situated deeper than the planned bottom of the tile field trench at all points along the proposed location of the tile field.
b) No evidence of water table in the soil.
c) Weathered diabase to be continuous and without hard rock interruptions, over each section of tile field. Sections to be no less than 50 feet in length.
d) Acceptable rates of absorption in the weathered diabase as demonstrated by percolation tests.

In reply to a request by Houston for clarification, the Commissioner explained that the number of soil borings or other tests was

left to Houston's discretion, but that final approval would not be given until the local Health Department was satisfied that there was a three-foot layer of weathered diabase beneath the bottom of the tile field trenches. Houston filed with Borders a report dated August 16, 1977, for sites 1 and 2. For the preferred location, site 1, the report showed a layer of weathered diabase beginning at a depth of thirty to forty-eight inches and extending downward to seventy-two inches. Houston recommended in his report that his original recommendation of seventy-two inches for tile depth be amended to forty-eight to sixty inches.

In October, 1977, after Godfrey had initiated this cause in the trial court, Borders, Burke, and Bodkin examined the rejected Houston sites 1 and 2 and a third proposed by Houston. They found and reported the same soil characteristics included in their prior rejection reports as well as standing water and wet sand in some of the test pits. Meyer also investigated the three sites. On site 1 he found standing water in two test pits and variable depths to the weathered diabase as well as to hard rock, thus indicating pockets. He reported that the weathered zone did not meet the Commissioner's depth criteria. On site 2 he found standing water in three test pits, indicating slow absorption, and areas shallow to rock and areas of deep clay. On site 3 he found evidence of a seasonal water table and variable depths to weathered material as well as to hard rock. Neither Godfrey nor Miller appealed the rejection of these sites within the agency.

At trial, Miller testified in effect that Borders would not approve any site, regardless of its characteristics. Miller, a building contractor in Manassas, said that he planned to build a substantial residence on the Godfrey land if he could install a septic system; that he had installed many such systems; that after Borders rejected his 1976 application, he employed Thomas; and that, based on the Thomas report, he submitted the other two applications that were disapproved by agency representatives and on appeal again rejected after the formal hearing. Borders refused to consider permitting the septic system to be extended to the depth recommended by Thomas. According to Miller, Borders said he had condemned the ground, he was not going to permit a house to be built there, and "[w]e are just not going to allow septic tanks in this county anymore."

Miller said that Borders suggested Houston as a local person whose recommendations for a system would be acceptable. How-

ever, when Houston recommended the same sites as Thomas, Borders rejected the application, stating, "I am going to see to it that you don't get it." Miller asserted that there were thirty-one houses within two miles of the property with septic systems, and he knew of only one that had failed, and that one only because it was improperly installed. Finally, Miller said that the Health Department representatives would not examine the test pits that had been excavated in an effort to comply with the guidelines prescribed by the Commissioner.

Godfrey testified that his contract to sell the land to Miller was conditioned on obtaining a septic-system permit. He corroborated Miller's testimony that there was bad feeling between Borders and Miller, but conceded that to his knowledge Miller had no comparable conflicts with Burke, Bodkin, or Meyer. Although Godfrey said that the Health Department representatives refused to examine the soil at the proposed sites below three feet, he acknowledged that Meyer had gone into the test pits dug below that depth and had made a thorough examination.

 Court review of the agency decision of July 28, 1977, is authorized because the Godfreys have alleged arbitrariness therein. Code § 9-6.14:15(iii). Under Code § 9-6.14:17[3] the bur-

---

[3] § 9-6.14:17. Issues on review.—The burden shall be upon the party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: (1) accordance with constitutional right, power, privilege, or immunity, (2) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (3) observance of required procedure where any failure therein is not mere harmless error, and (4) the substantiality of the evidential support for findings of fact. The determination of such fact issue is to be made upon the whole evidential record provided by the agency if its proceeding was required to be conducted as provided in § 9-6.14:8 or § 9-6.14:12 of this chapter or, as to subjects exempted from those sections, pursuant to constitutional requirement or statutory provisions for opportunity for an agency record of and decision upon the evidence therein. When the decision on review is so to be made on such agency record, the duty of the court with respect to issues of fact is limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did. Where there is no such agency record so required and made, any necessary facts in controversy shall be determined by the court upon the basis of the agency file, minutes, and records of its proceedings under § 9-6.14:7 or § 9-6.14:11 as augmented, if need be, by the agency pursuant to order of the court or supplemented by any allowable and necessary proofs adduced in court except that the function of the court shall be to determine only whether the result reached by the agency could reasonably be said, on all such proofs, to be within the scope of the legal authority of the agency. Whether such fact issues are reviewed on the agency record or one

den is upon the party complaining of agency action to designate and demonstrate an error of law subject to review, and the determination of an issue of fact is to be made upon the agency record if the proceedng was required to be conducted under Code § 9-6.14:12. In the present case, there was a public hearing conducted in accordance with the provisions of § 9-6.14:12. As to issues of fact that were, or reasonably could have been, determined by the agency, the reviewing court is limited to the agency record.

Although the Godfreys in their pleadings complained only of the agency decision of July 28, 1977, on brief and in oral argument they asserted that much of the alleged arbitrary action occurred after that date. The trial court ordered that the permit be issued for the site recommended by Houston in his report of May 31, 1977 (Houston site 1) and the Godfreys have asked that this ruling be affirmed. Since the Board has conceded that the Godfreys were not required to exhaust their administrative remedies as to the site, the informal rejection by the Board's subordinates, after July 28, 1977, of Houston site 1 becomes a crucial point of our analysis.

 The denial of the application after the formal hearing and the informal rejection of the post-hearing applications were agency "case decisions," Code § 9-6.14:4D, but only the formal denial disposed of a litigated issue within the meaning of § 9-6.14:12. The scope of court review of a litigated issue under the APA is limited to determination whether there was substantial evidence in the agency record to support the decision. Code § 9-6.14:17. The agency argues that it should not be subjected to court review of matters it had no opportunity to consider, such as Miller's trial allegations of arbitrary acts by Borders. The agency says that Miller could have related Borders' actions, at least in part, at the public hearing at which he declined to testify.

 The question whether agency personnel acted arbitrarily and capriciously was not an issue of fact before the Commissioner, especially as to actions by subordinate officials after the agency decision of July 28, 1977.[4] We believe, however, that the review-

made in the review action, the court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted. (1975, c. 503.)

[4] One textwriter has stated that "the arbitrary-capricious test applies whenever the record for review does not include a transcript of evidence taken in a proceeding on the record." Davis, Administrative Law Treatise, § 29.00-1, 528 (1982 Supp.).

ing court did not abuse its discretion in admitting evidence to support the allegation that the agency decided the case arbitrarily or in bad faith, but such evidence should be limited to that purporting to show that the agency denied the applicant a fair and impartial review of his application in accordance with proper procedures.[5] *See Gas Corp.* v. *Gas Light Co.,* 201 Va. 370, 379, 111 S.E.2d 439, 445 (1959); *Weyerhaeuser* v. *Costle,* 590 F.2d 1011 (D.C. Cir. 1978); Davis, Administrative Law Treatise, § 29.00-2, 536-40 (1982 Supp.). Where the proffered evidence tends to show that the fact-finding procedure was tainted by unfair prejudice or animosity, the agency may be said to have decided the case on factors irrelevant to the issues of fact before it. *See Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402 (1971).[6] A reviewing court may not, however, use its review of an agency's procedures as a pretext for substituting its judgment for the agency's on the factual issues decided by the agency. *See A.B.C. Board* v. *Village Grill,* 217 Va. 632, 231 S.E.2d 327 (1977); *City of Lynchburg* v. *Telephone Company,* 200 Va. 706, 107 S.E.2d 462 (1959) (both pre-APA cases).

Thus, in *Va. ABC Comm.* v. *York St. Inn,* 220 Va. 310, 257 S.E.2d 851 (1979), a case arising under the APA, the Alcoholic Beverage Control Commission, after an informal conference, reviewed and affirmed an inspector's refusal to approve a licensee's sale of alcoholic beverages on a counter inlaid with backgammon boards. The licensee proceeded by declaratory judgment in the trial court to challenge the Commission decision, and the court ruled that the decision was arbitrary and capricious. On appeal, we upheld the trial court's jurisdiction to entertain the licensee's challenge, but reversed the court's ruling that the Commission had acted arbitrarily and capriciously. We held that, considering the presumption of official regularity, the experience and specialized competence of the Commission, and the purposes of the basic law under which the Commission has acted, expressly mandated by § 9-6.14:17, it could not reasonably be said that the Commission acted beyond the scope of its authority. 220 Va. at 316, 257 S.E.2d at 855.

---

[5] *Cf. Commonwealth* v. *County Utilities,* 223 Va. 534, 290 S.E.2d 867, (1982) (this day decided).

[6] It has been said that the scope of court review under the Virginia APA is "virtually identical" to that in the Federal Administrative Procedure Act. Annual Survey of Virginia Law, 61 Va. L. Rev. 1632, 1639 (1975).

■ There has been confusion under the Federal Administrative Procedure Act in distinguishing the substantial evidence test from the arbitrary and capricious standard. Thus, one federal court has noted "an emerging consensus of the Courts of Appeals" that the distinction between the two is "largely semantic." *Pacific Legal Foundation* v. *Department of Transportation,* 593 F.2d 1338, 1343, n.35 (D.C. Cir.), *cert. denied,* 444 U.S. 830 (1979). We conclude that under the APA, whether the agency action is formal or informal, the sole determination by the reviewing court as to issues of fact before the agency is whether there was substantial evidence in the agency record to support the agency decision.

■ In the present case, it is apparent that there was substantial evidence in the records of both the formal and informal agency decisions to support the agency findings in both instances. The Commissioner's letter of July 28, 1977, cited the evidence from the record that he relied on in denying the two Thomas site applications. Indeed, the Godfreys, conceding that there is no substantial evidence question, do not challenge the evidence, or the reasonableness of the prospective conditions imposed by the Commissioner in his letter decision. They argue, rather, that Borders declined to make the necessary tests to ascertain that the conditions had been met.

Regardless of what Borders may have said or done, the Houston report of August 16, 1977, part of the agency record of its informal denials of the post-hearing applications, shows conclusively that the Commissioner's conditions were not met. In that report, Houston requested that the depth of the tile drains be reduced to forty-eight to sixty inches from the seventy-two inches he had previously recommended. Using a depth of forty-eight inches, Houston's soil profiles would show a layer of weathered diabase below the drain tiles approximately two feet in depth on site 1, although the Commissioner's first condition, again emphasized in his later clarification, was a layer of such material with a minimum depth of three feet. Thus, as Meyer reported, the thickness of the weathered zone below the drain tiles did not meet the stated requirements. Meyer further reported that hard rock was encountered at "rather shallow" depths in the middle of the site. If the drain tiles were laid at a depth of sixty inches, of course, the layer of weathered diabase would be only one foot deep. Borders, Burke and

Bodkin gave as their reasons for rejecting the post-hearing applications the inadequate depth to rock and a seasonal water table.

The trial court nevertheless could have properly afforded the Godfreys relief if it had correctly found that statements and actions by Borders which were irrelevant to the agency's fact-finding role infected the entire agency proceedings with unfair prejudice. The record shows, however, that the final rejection of Houston site 1, as well as the Thomas sites, was based upon substantial and conclusive evidence other than Borders' findings. There is no evidence that anyone other than Borders acted arbitrarily toward the Godfreys or Miller, and the evidence shows that Burke, Bodkin and Meyer examined the proposed sites and made separate reports listing problems that required rejection of the applications. There is a presumption that these public officials acted correctly, and there is no evidence to the contrary. We hold that the court's finding of arbitrary and capricious action by the agency in denying the permits was plainly wrong.

Accordingly, we will reverse the decree of the trial court and dismiss the cause of action.

*Reversed and dismissed.*