COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Lemons
Argued at Norfolk, Virginia


SIGHTS & BRIGHTWATERS INVESTORS, LTD.,
 t/a THE PIT STOP
                                   MEMORANDUM OPINION[*] BY
v.        Record No. 0378-98-1    JUDGE DONALD W. LEMONS
                                      OCTOBER 27, 1998
VIRGINIA ALCOHOLIC BEVERAGE CONTROL BOARD


        FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                   Verbena M. Askew, Judge

          Michael P. Lafayette (Michael B. Ware; Simon,
          Lafayette & Associates; Jones, Blechman,
          Woltz & Kelly, on briefs), for appellant.

          (Mark L. Earley, Attorney General; Michael K.
          Jackson, Senior Assistant Attorney General;
          Louis E. Matthews, Jr., Assistant Attorney
          General, on brief), for appellee.



        Sights and Brightwaters Investors, Ltd. appeals the final

order of the circuit court upholding the denial of an on-premises

beer license by the Virginia Alcoholic Beverage Control Board.

Because the trial court committed no error, we affirm.

                           BACKGROUND

        On March 20, 1997, Sights and Brightwaters Investors, Ltd.,

t/a "The Pit Stop," appellant, ("Sights") agreed to purchase the

assets of a restaurant located at 15764 Warwick Road in the City

of Newport News.  Sights agreed to manage the seller's restaurant

until Sights obtained its permits and licenses, including a

license from the Virginia Alcoholic Beverage Control Board ("ABC

        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

Board") to sell beer on-premises.

On April 15, 1997, at approximately 8:00 p.m., while Sights was acting as the general manager of the premises, Jeffrey Cook entered the establishment with several friends, including Eli Gibbs and Michael Moore. The group remained at the restaurant until between 11:00 and 11:30 p.m. Kara E. Rich, a waitress, testified that she served the men two pitchers of beer from the time they arrived until her shift ended between 9:00 and 9:30 p.m. A written statement of another waitress, Russchelle King, revealed that she served the men "probably three pitchers of beer" after Rich's shift ended.

A short time before the men left the premises, an altercation broke out between Cook and Moore. The manager was notified that Cook had become obnoxious and could possibly be intoxicated. The bouncer of the establishment then took Cook's keys from Moore and gave them to Gibbs, who returned the keys to Cook after the men left the premises.

The altercation continued between Moore and Cook after they left the restaurant, and as they walked down the street to a gas station parking lot. At this time, another individual took Cook's wallet, and Cook ran to his automobile to retrieve a handgun. The police were called and upon seeing the police arrive, Cook drove away in a reckless manner and subsequently crashed into a tree. He was killed instantly.

The ABC Board objected to the license application filed by

Sights, charging that, "[t]he applicant sold alcoholic beverages other than as permitted by the ABC Act while the application was pending."  After a hearing before an ABC hearing officer, the objection was upheld and the license was denied.

Sights appealed the hearing officer's decision to the ABC Board.  In its "Final Decision and Order Refusing License," the ABC Board adopted the hearing officer's initial decision and again refused Sights' beer license.  Sights appealed the ABC Board's final order to the Circuit Court of the City of Newport News.  The trial court upheld the ABC Board's order and dismissed Sights' appeal.

On appeal to the Court of Appeals, Sights argues that:  (1) the record contains no substantial evidence of a violation by Sights while its ABC license application was pending; (2) the ABC Board violated Sights' statutory and constitutional rights to due process of law by failing to provide notice of the facts and law asserted against Sights; (3) the ABC Board and the trial court erred by considering evidence not in the record; and (4) Sights should be awarded attorney's fees and costs if it substantially prevails on appeal.

### SUBSTANTIAL EVIDENCE

The standard by which a trial court must review the findings of a state agency is not equivalent to a trial de novo.  School Board v. Nicely, 12 Va. App. 1051, 1062, 408 S.E.2d 545, 551 (1991).  In reviewing an agency decision, "[t]he scope of court

- 3 -

review of a litigated issue under the [Administrative Process Act] is limited to determination [of] whether there was substantial evidence in the agency record to support the decision." State Board of Health v. Godfrey, 223 Va. 423, 433, 290 S.E.2d 875, 880 (1982); see Code § 9-6.14:17. The substantial evidence standard is "designed to give great stability and finality to the fact-findings of an administrative agency." Va. Real Estate Commission v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983). A trial court may reject the findings of fact "only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." Id. (citing B. Mezines, Administrative Law § 51.01 (1981)).

The ABC Board upheld the hearing officer's decision that "the applicant sold alcoholic beverages other than as permitted by the A.B.C. Act while the application was pending." The ABC Board determined that "the initial decision [sh]ould be adopted and incorporated herein by reference as the final decision of the Board."

At the hearing before the ABC hearing officer, the evidence revealed that Cook, Moore and Gibbs were present at the establishment under Sights' management for approximately 2½ to 3 hours. The written statement of Michael Moore, Cook's friend, was introduced, and stated that Cook "had been drinking alot [sic]" before the men arrived at the establishment, that they

consumed four pitchers of beer while there, and "he [Cook] was drunk." Moore's statement also described an altercation which broke out between himself and Cook, and stated that Cook was acting "like a real punk." Moore's statement further revealed that Cook "drank most of the four pitchers" and that Cook questioned Gibbs and Moore about whether they could "handle drinking."

Eli Gibbs' written statement was also introduced, which recounted an altercation between Moore and Cook after Moore requested that the bouncer take Cook's keys. Detective Dallas Mitchell testified that statements made by Moore and Gibbs immediately after the incident supported that Moore and Cook "had got into a fight due to the way Jeffrey Cook was acting and intoxicated [sic]." Evidence of Cook's blood alcohol content, almost three times the legal limit, was also introduced.

Kara Rich, the first waitress to serve the men, testified that after she served the men two pitchers of beer, she finished her shift and joined them. She played pool with Cook. While she stated that she did not observe anything unusual in Cook's behavior, she did not have any direct conversation with him. Rich stated that after she left Cook, she was not paying "real close" attention to him, and did not even notice when he left.

Russchelle King, the second waitress to serve the men, made a statement in which she said that she served the three men "probably three pitchers," but that she was not certain because

she "was serving a lot of people." King also said, "I don't remember him [Cook] being there the whole entire time, maybe I just didn't pay attention to him exactly." She described Cook as "mouthy." King's statement also revealed that Cook acted "punkish" and that when she said that she might have to call the bouncer over to his table, he responded "do whatever you know I'll mess him up whatever [sic]. . . ."

Robert Kleinschmidt, the bouncer, made a statement in which he acknowledged interacting with the men two times that evening. The first time, the men were being rowdy and he had to quiet them down. The second time occurred when Cook approached Kleinschmidt to obtain his car keys, which Moore was holding. Kleinschmidt's statement also contained an admission that he had "no idea" how much the men had to drink and that he guessed that the men had been in the establishment for "two and a half, three hours," but that number was "only a rough estimate cause [sic] I see a lot of people."

There was conflicting evidence introduced by Sights which supported its contention that it did not know, or have reason to know, that Cook was intoxicated at the time its employees served him. Rich also testified that she did not think that Cook was intoxicated at the time she served him. King's statement included her observation that when she served the men, "they seemed fine." Gibbs made a statement that the three men had split only two pitchers of beer between them the entire time that

they were at the establishment.

The hearing officer concluded that the evidence showed that the applicant, Sights, sold beer to a person that it had reason to believe was intoxicated. Specifically, the hearing officer concluded:

> [T]he subject's behavior was erratic and he was argumentative, particularly with one of his companions. At the time of the subsequent autopsy, the blood alcohol content was .23 percent, and the evidence shows he had consumed alcoholic beverages prior to his arrival and continued to consume a substantial quality [sic] of beer while on the premises.

The hearing officer discounted the testimony of Sights' witnesses, finding that the testimony was "not reliable" because they were "either not eyewitness observations or the statements were contrary to the weight of the evidence."

Code § 4.1-304 proscribes selling alcoholic beverages to a person who the seller knew, or had reason to believe, was intoxicated at the time of the sale. Whether the employees were inattentive to the numerous signs of intoxication exhibited by Cook – as observed by his companions – or the substantial amount of beer consumed by him on the premises, is irrelevant to whether there has been a violation of Code § 4.1-304. As sellers, Sights' employees were charged with gauging the level of intoxication in their patrons, and their failure to do so does not absolve Sights of the obligations of its license application. A licensee may not hide behind self-imposed ignorance.

Based upon the evidence, including Cook's antagonistic and argumentative demeanor, and the amount of alcohol consumed by him over the course of the evening,[1] Sights' employees did have reason to believe that Cook was intoxicated. Despite the objective manifestations of his intoxication, they continued to serve him beer while he remained on the premises. Therefore, we hold that substantial evidence was introduced to support the hearing officer's conclusions.[2] There has been no showing that a reasonable mind would necessarily disagree with these findings, and sufficient evidence exists to sustain the objection that Sights sold alcoholic beverages to a person it had reason to know was intoxicated at the time of the sale, a violation of Code § 4.1-304.

## NOTICE OF FACTS AND LAW AND EVIDENCE OUTSIDE THE RECORD

Prior to a hearing on the issuance of a license, the ABC Board is required to provide an applicant with notice of any issues or objections. Code § 9-6.14:12; Regulations of the Virginia Alcoholic Beverage Control Board, 3 VAC § 5-10-140. The

---

[1]According to the two waitresses, the three men were served five pitchers of beer over a period of 2½ to 3 hours. Additionally, Cook had been drinking before his arrival at the restaurant.

[2]A review of the evidence does not support the hearing officer's finding that the bouncer, Robert J. Kleinschmidt, returned Cook's keys to Cook. The only evidence introduced indicates that Moore obtained Cook's keys directly from Cook, and when Cook asked Kleinschimdt to retrieve his keys from Moore, Kleinschimdt gave the keys to Gibbs, not Cook.

- 8 -

actions of the ABC Board in "granting or refusing to grant a license shall be subject to review in accordance with the Administrative Process Act."  Code § 4.1-224.  The Administrative Process Act (the "APA") provides that the ABC Board must provide "reasonable notice" to an applicant of the "matters of fact and law asserted or questioned by the agency."  Code § 9-6.14:12(B).  This notice must include the "time, place and issues involved."  3 VAC § 5-10-140.

The Notice of Hearing initially received by Sights stated two objections to the issuance of an on-premises beer license. The two objections were:

> (1)  "The applicant sold alcoholic beverages other than as permitted by the ABC Act while the application was pending"; and (2) "The applicant has not demonstrated financial responsibility sufficient to meet the requirements of the business proposed to be licensed."

The second objection was withdrawn prior to the evidentiary hearing held before the hearing officer, leaving only the objection related to the impermissible sale of alcoholic beverages.

At Sights' request, filed contemporaneously with its notice of appeal to the circuit court, the ABC Board provided it the meeting minutes from the hearing before the ABC Board.  The minutes contained the following statement, "Uphold the Hearing Officer's decision to refuse the beer on-premises license – License at this location revoked due to 2 deaths and other

problems." On appeal, Sights argues that it had never been given notice of an objection related to either "2 deaths" or "other problems."

When a trial court reviews the decision of an agency, the "duty of the court with respect to issues of fact is limited to ascertaining whether there was substantial evidence <u>in the agency record</u> upon which the agency as the trier of facts could reasonably find them to be as it did." Code § 9-6.14:17 (emphasis added). On appeal, Sights also argues that the reference to "2 deaths and other problems" fell outside the scope of the agency record.

The record reveals that the hearing before the hearing officer addressed both Sights' pending application and the revocation of the current license held by LOLLIPOP II, Inc. at the same location. In calling the hearing to order, the hearing officer stated that "this matter comes to a hearing because of charges filed against LOLLIPOP II, Inc., trading as Bluebeard Go Go 2 . . . and a companion application objection as to Sights and Brightwaters LTD, trading as the Pit Stop, which is at the same location. . . ." Testimony at the hearing included the fact that the current owner had been charged with murder and "he was barred [from the business] because it was a condition of his release from jail on the charge of murder."

The ABC Board's final order of October 8, 1997 stated that the decision was based upon the objection that "the applicant

sold alcoholic beverages other than as permitted by the A.B.C. Act while the application is pending." Specifically, the order cited violations of Code §§ 4.1-222(A)(1)(n), 4.1-302 and 4.1-304. Code § 4.1-222(A)(1)(n) proscribes violations of the ABC Code while a license application is pending. Code § 4.1-302 states the penalty for the illegal sale of alcoholic beverages generally. Code § 4.1-304 proscribes the sale of alcoholic beverages to any person whom the seller "knows, or has reason to believe," is intoxicated at the time of the sale. The final order further states that, "upon review of the record, the Board being of the opinion that it has reasonable cause to believe the objection is substantiated by the evidence, the license should be refused, and the initial decision [sh]ould be adopted and incorporated by reference as the final decision of the Board . . . ." (Emphasis added).

The ABC Board's order adopted and incorporated the findings of the hearing officer. The mention of "2 deaths and other problems" contained in the ABC Board minutes constitutes a gratuitous reference to the revocation of the current license, held by LOLLIPOP II, Inc., rather than a basis upon which the ABC Board relied in refusing Sights' license application. We hold, therefore, that Sights did receive proper notice of the facts and law upon which its license was refused, and that therefore, neither the Board, nor the trial court, considered evidence outside the scope of the record.

ATTORNEY'S FEES AND COSTS

Pursuant to Code § 9-6.14:21, a party is entitled to recover attorney's fees and costs when it substantially prevails on the merits of an appeal and where the agency's position is not substantially justified.  Because Sights has not prevailed on the merits of this appeal, we affirm the trial court's refusal to award Sights attorney's fees and costs.

CONCLUSION

Because there was substantial evidence in the agency record to support the decision to deny Sights' application, because the procedures were based upon proper notice to Sights, and because neither the Board nor the trial court considered evidence outside the agency record, the trial court's order upholding the agency's determination is affirmed.

Affirmed.

Benton, J., dissenting.

The crux of the proceeding in this case concerned whether Sights "[sold] any alcoholic beverages to any person when at the time of such sale [Sights] kn[ew] or ha[d] reason to believe the person to whom the sale [was] made [was] . . . intoxicated." Code § 4.1-304. Accepting as true all the facts relied upon by the ABC Board and cited in the majority opinion, none of the evidence tended to prove the violation.

No evidence proved that when the patron was in the restaurant, he exhibited conduct indicating that he was intoxicated and, nevertheless, was served alcoholic beverages. Kara Rich, a waitress, testified that she served two pitchers of beer to the patron and his companions over a period of two hours. During that time, she observed them playing pool and darts. When her work shift ended, she played two or three games of pool with the patron. She testified that the patron was not unsteady on his feet, did not slur his speech, and showed no other signs of intoxication. Another waitress, Russchelle King, who also served beer to the group, stated in an affidavit that the patron and his companions exhibited no conduct indicating they either had been drinking before they arrived at the restaurant or were intoxicated in the restaurant. She observed the patron and his friends playing darts and saw no evidence that any of them were intoxicated.

Significantly, the hearing officer noted in his findings of

fact the following testimony, which described the conduct of the patron prior to the altercation:

> [Waitress,] Kara Rich testified that [the patron] was not showing evidence of intoxication by the time she had worked that evening, and that she had consumed beer with the group after work. After that, she stated she shot pool with [the patron] until approximately 10:30 p.m. When she turned her attention to another patron, she stated she did not notice anything which indicated intoxication on the part of [the patron].

The hearing officer pointed to no evidence that tended to prove the patron was served beer when he appeared intoxicated or after he became argumentative. Indeed, the uncontradicted evidence from both waitresses was that the patron gave no indication of intoxication prior to his verbal altercation with his companion. The hearing officer also made no finding that the waitresses were "inattentive to . . . signs of intoxication" or were "hid[ing] behind self-imposed ignorance." Moreover, no testimony by the patron's companions suggests that the patron showed signs of intoxication while he was being served beer in the restaurant.

At 11:30 p.m. the patron engaged in a verbal altercation with one of his companions. The evidence proved that the patron's condition became apparent only after the verbal altercation occurred. When the patron became argumentative and disruptive, he was not again served alcoholic beverages. After the verbal altercation, one of the restaurant's employees escorted the patron from the restaurant and gave the patron's car keys to his companion. Outside the restaurant, the patron became

involved in an incident with a man who took the patron's wallet. The patron then obtained his keys from his companion, drove his car off the road, and died in the accident.

The evidence that the patron had a high blood alcohol content after his death is insufficient to prove that, while the patron was in the restaurant drinking alcoholic beverages, he appeared intoxicated or exhibited conduct indicating intoxication. Absent evidence in the record and a finding by the hearing officer, we have no basis on appeal to speculate that the waitresses were "inattentive." No evidence proved that any of the employees of the restaurant either were inattentive to the patron's condition or had reason to believe the patron was intoxicated. Indeed, common experience tells us that "[a person] under the influence of intoxicants may at times conduct himself [or herself] with the utmost care and dignity." Spickard v. City of Lynchburg, 174 Va. 502, 504, 6 S.E.2d 610, 611 (1940).

"We [have] recognize[d] that the substantial evidence standard accords great deference to the findings of the administrative agency, but even under this standard the evidence must be relevant to the conclusion reached." Atkinson v. ABC Commission, 1 Va. App. 172, 178, 336 S.E.2d 527, 531 (1985). When, as in this case, "there is not substantial evidence in the record to support the [agency's decision]," id., we must reverse the circuit court's order upholding that decision. No evidence supports the conclusion that the patron was sold beer when the

- 15 -

employees of the restaurant knew or had reason to believe the patron was intoxicated.

For these reasons, I would reverse the trial judge's order upholding the ABC Board's refusal to grant a license to Sights.