COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Millette
Argued at Alexandria, Virginia


FREDERICK COUNTY BUSINESS PARK, LLC AND
   MAYNARD WILLARD
                                                          OPINION BY
v.        Record No. 2315-07-4            JUDGE LeROY F. MILLETTE, JR.
                                                          MAY 20, 2008
VIRGINIA DEPARTMENT OF ENVIRONMENTAL
   QUALITY AND DAVID K. PAYLOR, DIRECTOR,
   VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUAILTY


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                            Jane Marum Roush, Judge

            Steven T. Webster (Aaron S. Book; Webster Book LLP, on briefs),
            for appellants.

            Kerri L. Nicholas, Assistant Attorney General (Robert F. McDonnell,
            Attorney General; Roger L. Chaffe, Senior Assistant Attorney
            General; David C. Grandis, Assistant Attorney General, on brief), for
            appellees.


        Frederick County Business Park (FCBP) appeals from a final judgment of the circuit

court upholding the Virginia Department of Environmental Quality's (DEQ) classification of its

proposed facility as a materials recovery facility (MRF).  On appeal, FCBP argues DEQ

improperly interpreted the solid waste management regulations and the evidence was insufficient

to support DEQ's findings that the proposed facility is a MRF.  Rather, FCBP asserts its

proposed facility is properly classified as a recycling center.  Additionally, DEQ appeals the

circuit court's finding that its March 26, 2007 letter to FCBP was a case decision.

        Code § 10.1-1408.1 states, in part, "'recycling' means any process whereby material

which would otherwise be solid waste is used or reused, or prepared for use or reuse, as an

ingredient in an industrial process to make a product . . . ."  9 VAC 20-80-10 defines a "materials

recovery facility" as "a solid waste management facility for the collection, processing and recovery of material such as metals from solid waste . . . ." We hold DEQ did issue a case decision and FCBP's proposed facility does fall within the definition of a MRF. Thus, we affirm the circuit court's ruling.

## I. Facts and Procedural History

The facts in this appeal are not in dispute. On December 28, 2006, FCBP wrote a letter to DEQ's Valley Regional Office, stating its intent to operate a business that would pick up construction waste, primarily from new home construction, and take it to its facility. When the construction waste arrived at the facility, FCBP would: recover and recycle concrete for use as "21A" sub-base for roads, sidewalks, and curb and gutter; recover and prepare corrugated cardboard for use by remanufacturers of cardboard; recover and prepare mixed paper for use by remanufacturers of paper; recover and prepare plastics and metal for reuse by others as ingredients in their industrial processes; recover and prepare wood products for use by others as ingredients in their industrial processes; and recover and prepare drywall for use by others in the production of drywall and lime.[1]

FCBP's attorney and DEQ's Valley Regional Office Senior Environmental Engineer, Rebecca Dietrich (Dietrich), talked via email and set up a meeting for February 12, 2007 to discuss the matters raised in FCBP's letter. Prior to the meeting, Dietrich corresponded with Graham Simmerman (Simmerman), DEQ's Valley Regional Office Waste Compliance Manager, and G. Stephen Coe, from DEQ Recycling, regarding FCBP's proposed facility.

The day before the scheduled meeting, FCBP's attorney responded to some questions from Dietrich. The attorney stated FCBP would bring containers of construction waste to the

---

[1] FCBP later amended this list via an email to DEQ, stating that due to current market conditions, the facility would not be accepting drywall.

proposed facility, the materials would be separated into groups (wood, paper, corrugated cardboard, metal, drywall, and concrete) and each of the materials would then be processed. FCBP's attorney also stated, "the overwhelming majority of waste [will] be recycled," and remaining waste residue, consisting of "Styrofoam, dirt, sod and some debris that is too small to handle . . . [will] be placed back into the container and taken to the landfill."

At the meeting, handwritten notes were taken by a DEQ employee. These notes recite the specific materials FCBP's proposed facility would handle and each of the materials' exemptions under the Virginia Administrative Code. The list of materials, along with exemptions, were written as follows: Concrete: § 20-80-150(E)(2)(a)(14); Corrugated Cardboard: § 20-80-160(C)(1); Mixed Paper: § 20-80-160(C)(1); Plastics: § 20-80-160(C)(5); Metal: § 20-80-150(H); Wood: § 20-80-150(K). After the meeting, DEQ prepared a matrix of all the materials and applicable exemptions. The handwritten notes also stated "[i]nitially, as a minimum, approximately 70% of material rec'd at fac. will be recycled."[2]

Subsequent to the February 12, 2007 meeting, but prior to issuing a written response, Dietrich sought advice and input regarding the classification of FCBP's proposed facility from Simmerman, Paul Farrell, from DEQ's Office of Waste Permitting, and Amy Owens, Director of DEQ's Valley Regional Office. In an email to Dietrich, Simmerman stated that the difference between a MRF and a recycling center "is a Departmental decision, not strictly a regional interpretation."

On March 26, 2007, DEQ mailed FCBP's attorney a letter detailing the agency's determination that the proposed facility would be a MRF and not a recycling center. DEQ found

---

[2] A February 13, 2007 email from Dietrich to Paul Farrell, from DEQ's Office of Waste Permitting, recites that "[FCBP's attorney] stated in the meeting yesterday that, initially 70% of the waste material that comes to the facility will be recycled, with the hope that a higher percentage will be recycled in the future. The remaining waste will be landfilled."

"a facility that receives mixed wastes for on-site processing into recyclable and unrecyclable fractions is classified as Materials Recovery Facility (MRF) . . . [n]o specific exclusion from regulation is provided . . . for a Recycling Facility using the described processes." The letter also stated that materials coming to a recycling facility are presorted from waste at the source of generation, while materials coming to a MRF are not presorted. The letter concluded that because FCBP's proposed facility would be a MRF, it needed to submit a permit-by-rule application.

On May 21, 2007, FCBP appealed to the Fairfax County Circuit Court pursuant to the Virginia Administrative Process Act (VAPA). On August 24, 2007, the parties appeared before the trial court on FCBP's administrative appeal. After conducting a hearing on the merits of the appeal, the trial court ruled that DEQ's March 26, 2007 letter to FCBP was a case decision. Additionally, the trial court upheld DEQ's finding that FCBP's proposed facility would constitute a MRF:

> [T]his is an area in which deference is owed to DEQ's determination. Its decision about whether this is a recycling plant or materials recovery plant is a question, I think, within their specialized expertise and their conclusion that this is more than a de minimis amount of materials that are not recyclable and that the 30 percent that was discussed would make it a materials recovery facility I don't find is arbitrary and capricious, and so I'm going to defer to the DEQ on this.

This appeal followed.

## II. Standard of Review

The VAPA governs appeals from DEQ. Code § 10.1-1457; 9 VAC 20-80-100. The complaining party bears the burden of proving that an error of law was committed. Code § 2.2-4027; Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 241-42, 369 S.E.2d 1, 6-7 (1988). Thus, DEQ bears the burden of proof on the case decision issue, while FCBP bears the burden of proof regarding the regulatory interpretation issue.

- 4 -

Pursuant to the VAPA, factual determinations made by an agency are accorded great deference. Johnston-Willis, Ltd., 6 Va. App. at 242-43, 369 S.E.2d at 7. "The duty of the court with respect to issues of fact shall be limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of facts could reasonably find them to be as it did." Code § 2.2-4027; State Bd. of Health v. Godfrey, 223 Va. 423, 435, 290 S.E.2d 875, 881 (1982).

Correspondingly, an appeal of an agency's interpretation of its own regulations,

> "where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts[, and] . . . judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of delegated discretion."

Vasaio v. DMV, 42 Va. App. 190, 196-97, 590 S.E.2d 596, 599 (2004) (quoting Johnston-Willis, Ltd., 6 Va. App. at 244, 369 S.E.2d at 8).

### III. Analysis

#### A. Case Decision

The first issue presented is whether the trial court erred in finding that DEQ's March 26, 2007 letter to FCBP was a case decision pursuant to Code §§ 2.2-4001 to 2.2-4023.[3] "Case decision" is defined under Code § 2.2-4001:

> [A]ny agency proceeding or determination that, under laws or regulations at the time, a named party as a matter of past or present fact, or of threatened or contemplated private action, either is, is not, or may or may not be (i) in violation of such law or regulation

---

[3] Under Rule 5A:21(b), the appellee can present additional questions to be decided by the Court of Appeals, so long as they provide a clear and exact reference to the page(s) of the transcript, written statement, record, or appendix where each additional question was preserved in the trial court. D'Auria v. D'Auria, 1 Va. App. 455, 461, 340 S.E.2d 164, 167 (1986) (Rule 5A:21 sections (b) and (e) read together allow the appellee to raise questions in his brief that were not raised by the appellant).

or (ii) in compliance with any existing requirement for obtaining or retaining a license or other right or benefit.

DEQ raises several arguments as to why the March 26, 2007 letter cannot be considered a case decision. DEQ contends the letter was not served upon FCBP as required of case decisions pursuant to Virginia Supreme Court Rule 2A:2. The relevant part of the Rule states:

> Any party appealing from a regulation or case decision shall file, within 30 days after adoption of the regulation or *after service of the final order in the case decision*, with the agency secretary a notice of appeal signed by him or his counsel. In the event that service of a case decision upon a party is *accomplished by mail*, 3 days shall be added to the 30-day period. *Service under this Rule shall be consistent with § 2.2-4023* and, if made by mail, shall be sufficient if sent by registered or certified mail to the party's last address known to the agency.

Rule 2A:2 (emphasis added).

Code § 2.2-4023 reads "[t]he terms of any final agency case decision, as signed by it, shall be served upon the named parties *by mail* unless service otherwise made is duly acknowledged by them in writing." (Emphasis added). Code § 2.2-4023 clearly holds a case decision can be properly served by mail. DEQ's March 26, 2007 letter was mailed to FCBP's attorney and, therefore, the method of service meets the requirements under Virginia law. <u>See</u> <u>Garraghty v. Virginia Ret. Sys.</u>, 45 Va. App. 1, 8, 608 S.E.2d 477, 480 (2005) (holding that a letter from the agency to appellant was not precluded from being considered a case decision even though it was addressed to appellant's attorney).

Further, DEQ argues the employee who wrote the letter, Dietrich, did not have authority from the agency to make a case decision and, thus, the letter was merely a response from a staff member to a public inquiry. However, the record belies this argument and shows that Dietrich did have authority to issue a case decision. In an email from Simmerman, DEQ's Valley Regional Office Waste Compliance Manager, to Dietrich regarding FCBP's proposed facility, he stated the proposed definitions of a MRF and recycling center "[are] a Departmental decision,

not strictly a regional interpretation." Additionally, Simmerman informed Dietrich that the letter

to FCBP "has been redrafted and approved by the regional management." Further, the letter took

over a month to compose and was edited and approved by various members of DEQ's

management. Thus, Dietrich appears to have had authority to issue a case decision. Importantly,

DEQ bore the burden of proof on this issue and failed to submit any evidence that proved

Dietrich lacked the requisite authority to write a case decision for DEQ.

DEQ's final three arguments revolve around the meaning of an "informal fact finding

proceeding" as defined by the Code:

> Agencies shall ascertain the fact basis for their decisions of cases
> through *informal conference* or consultation proceedings unless the
> named party and the agency consent to waive such a conference or
> proceeding to go directly to a formal hearing. Such conference-
> consultation procedures shall include *rights of parties to the case
> to* (i) have reasonable notice thereof, (ii) *appear in person or by
> counsel or other qualified representative before the agency or its
> subordinates*, or before a hearing officer *for the informal
> presentation of factual data, argument, or proof in connection with
> any case*, (iii) have notice of any contrary fact basis or information
> in the possession of the agency that can be relied upon in making
> an adverse decision, (iv) receive a prompt decision of any
> application for a license, benefit, or renewal thereof, and (v) be
> informed, briefly and generally in writing, of the factual or
> procedural basis for an adverse decision in any case.

Code § 2.2-4019(A) (emphasis added).

DEQ claims no informal fact finding proceeding took place because it did not assign a

presiding officer to oversee the February 12, 2007 meeting. However, the statute provides not

solely for a "hearing officer," but also allows the party to appear "before the agency or its

subordinates." Code § 2.2-4019(A)(ii). It is clear from the record the February 12, 2007

meeting took place between FCBP's attorney and a couple of DEQ employees, Dietrich and

Greg Adamson. Therefore, DEQ's argument regarding the lack of a presiding officer has no

merit.

DEQ argues that because no exhibits were prepared prior to the meeting, it could not be considered an informal fact finding proceeding. Nowhere in Code § 2.2-4019(A) does it state an agency must prepare exhibits prior to an informal fact finding proceeding; thus, this argument must also fail.

Finally, DEQ contends that prior to the meeting, it failed to send FCBP "notice of any contrary fact[s]" as required by Code § 2.2-4019(A)(iii). While the Code does contain this language, it is preceded by the phrase, "[s]uch conference-consultation procedures shall include *rights of parties to the case to*." Code § 2.2-4019(A) (emphasis added). Therefore, the requirement that DEQ provide FCBP with notice of contrary facts is a right that only FCBP may assert. As FCBP concedes that the February 12, 2007 meeting was an informal fact finding proceeding, it has waived any rights under Code § 2.2-4019(A) and, thus, DEQ cannot assert these rights on FCBP's behalf. Based on the plain meaning of the statutory and case law, the circuit court did not err in finding DEQ's March 26, 2007 letter to FCBP was a case decision. Kenley v. Newport News Gen. & Non- Sectarian Hosp. Ass'n, 227 Va. 39, 41-45, 314 S.E.2d 52, 53-56 (1984) (holding an agency letter to appellant was a case decision when, prior to publishing the letter, the parties participated in a meeting, appellant submitted extensive data to the agency about the proposed facility, and the letter applied the agency's rules and regulations to the specific facts of appellant's case).

### B. Definition of "Recycling" and "Materials Recovery Facility"

The legislature created DEQ to consolidate the functions of the Department of Waste Management, the State Water Control Board, the Department of Air Pollution Control, and the Council on the Environment. Code § 10.1-1183. DEQ is specifically authorized to supervise and control solid waste management activities within the Commonwealth. Code § 10.1-1402(1). Pursuant to the Solid Waste Management Regulations, DEQ "promulgates and enforces

regulations that it deems necessary to protect the public health, public safety, the environment, and natural resources." 9 VAC 20-20-50.

"'Statutes addressing the same subject are to be read *in pari materia* [that is, they should be] "read, construed and applied together so that the legislature's intention can be gathered from the whole of the enactments.""" Vasaio, 42 Va. App. at 199, 590 S.E.2d at 600 (quoting Alger v. Commonwealth, 19 Va. App. 252, 256, 450 S.E.2d 765, 767 (1994)). Guided by this principle, we turn to the parties' arguments involving Code § 10.1-1408.1 and 9 VAC 20-80-10, -150, -160, and -360.

As previously stated, we review with deference DEQ's findings of fact and interpretation of the solid waste management regulations. FCBP contends the DEQ case decision found the proposed facility would be engaged in activities defined as "recycling":

> *No permit shall be required pursuant to this section for recycling or for temporary storage incidental to recycling.* As used in this subsection, "*recycling*" *means any process whereby material which would otherwise be solid waste* is used or reused, *or prepared for use or reuse*, as an ingredient in an industrial process to make a product, or as an effective substitute for a commercial product.

Code § 10.1-1408.1(J) (emphasis added). DEQ counters that FCBP's reading of Code § 10.1-1408.1(J) is too narrow, failing to take into account all of the facts and additional regulations relating to this issue. Pursuant to 9 VAC 20-80-10, a MRF is defined as "a solid waste management facility for the collection, processing and recovery of material such as metals from solid waste . . . ." DEQ's case decision found that FCBP planned to truck discarded

materials from new home construction sites to the proposed facility and then remove recyclable materials from this waste for use or reuse.[4] The Code specifically defines "construction waste" as "solid waste." 9 VAC 20-80-10 ("[c]onstruction waste means solid waste which is produced or generated during construction, remodeling, or repair of pavements, houses, commercial buildings, and other structures"). Thus, the facility falls squarely within the definition of a MRF as FCBP planned to use the facility to reclaim recyclable materials from solid waste.

FCBP responds it would be impossible for the proposed facility to be a MRF because all of the materials it would handle are either defined as non-solid wastes or are conditionally exempt from being considered solid waste. 9 VAC 20-80-150 (specifically stating that wood, concrete, and metal are not solid wastes); 9 VAC 20-80-160 (conditionally exempting as solid waste paper, paper products, and plastic); 9 VAC 20-80-360 ("The regulations of this section [on MRFs] do not apply to . . . [t]he storage and treatment facilities associated with the management of materials conditionally exempt from this chapter on the basis of 9 VAC 20-80-160 C."). DEQ argues that FCBP intends to bring solid waste to the facility and then separate out the items specifically enumerated above. Thus, DEQ found these recyclable materials (wood, concrete, metal, paper products, and plastic) do not become exempt or excluded from regulation until *after* they are separated from all of the incoming solid waste. FCBP counters that if any percentage of the material is recyclable, then all of the material, recyclable and non-recyclable, is exempt from regulation.

---

[4] DEQ's case decision stated:

> [T]he proposed Facility intends to divert construction waste (primarily from new home construction) from the waste disposal stream for use, reuse, or preparation for use or reuse by others, as an ingredient in industrial processes to make various products. Various marketable materials will be separated at the Facility from incoming mixed construction wastes and stored in on-site containers for subsequent off-site use or reuse.

FCBP's contention would lead to an absurd result, with parties completely exempt from DEQ regulations when they reclaim and recycle just 1% of materials from solid waste. DEQ has the authority to regulate waste disposal in the interest of public health, safety, and the environment; therefore, we review DEQ's interpretation of the solid waste management regulations with deference. The record supports DEQ's finding that approximately 30% of the materials coming to FCBP's facility will be non-recyclable.[5] Therefore, DEQ did not act in an arbitrary or capricious manner when it determined more than a *de minimis* amount of solid waste would come to the facility and, therefore, found the facility would be operating as a MRF.

## IV. Conclusion

For the reasons stated herein, we hold the circuit court properly found DEQ did issue a case decision to FCBP. Furthermore, we affirm the circuit court's ruling upholding DEQ's determination that FCBP's proposed facility would be a MRF.

Affirmed.

---

[5] We give judicial deference to DEQ's findings of fact. Godfrey, 223 Va. at 435, 290 S.E.2d at 881. In a February 11, 2007 email, FCBP's attorney stated while "the overwhelming majority of waste will be recycled," the residue, consisting of "Styrofoam, dirt, sod and some debris that is too small to handle . . . will be placed back into the container and taken to the landfill." A DEQ employee's notes from the February 12, 2007 meeting recite that FCBP stated, "[i]nitially, as a minimum, approximately 70% of material rec'd at fac. will be recycled." A February 13, 2007 email from Dietrich recited, "[FCBP's attorney] stated in the meeting yesterday that, initially 70% of the waste material that comes to the facility will be recycled, with the hope that a higher percentage will be recycled in the future. The remaining waste will be landfilled."