COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick,[*] Judge Annunziata and
          Senior Judge Baker[**]
Argued at Alexandria, Virginia


CLARENCE H. CARTER, COMMISSIONER,
 VIRGINIA DEPARTMENT OF SOCIAL SERVICES
                                           OPINION BY
v.        Record No. 0088-97-4        JUDGE JOSEPH E. BAKER
                                          AUGUST 4, 1998
CRAIG GORDON


            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                   M. Langhorne Keith, Judge

          Gaye Lynn Taxey, Assistant Attorney General
          (James S. Gilmore, III, Attorney General;
          William H. Hurd, Deputy Attorney General;
          Siran S. Faulders, Senior Assistant Attorney
          General, on briefs), for appellant.

          Steven David Stone (Steven David Stone, P.C.,
          on brief), for appellee.



     In this appeal, we review a judgment rendered by the Circuit

Court of Fairfax County (trial court) which reversed and

dismissed findings made by the Virginia Department of Social

Services (DSS) that Craig Gordon (Gordon) had engaged in several

acts of child sexual abuse involving five students while he was a

physical education teacher and safety patrol leader at Virginia

Run Elementary School (the school).  The DSS is an agency subject

to the provisions of the Virginia Administrative Process Act

_____

     [*]On November 19, 1997, Judge Fitzpatrick succeeded Judge
Moon as chief judge.

     [**]Judge Baker participated in the hearing and decision of
this case prior to the effective date of his retirement on July
31, 1998 and thereafter by his designation as senior judge
pursuant to Code § 17-116.01.

(APA), see Code §§ 9-6.14:1 to 9-6.14:25, and this appeal results from investigations and findings of the DSS that were made pursuant to the APA.

The DSS contends the trial court erred in (1) finding that the record did not contain substantial evidence to support the five "founded" determinations of "level one" sexual abuse against Gordon, (2) ruling that the DSS deprived Gordon of due process, (3) denying the DSS's motion to reconsider, sever, and remand in part, and (4) awarding Gordon attorney fees under Code § 9-6.14:21. For the reasons that follow, we reverse the trial court's ruling and remand for entry of an order consistent with this opinion.

I.

Viewed in the light most favorable to the DSS, the agency record discloses that in March 1993, two students at the school accused Gordon of misconduct which led to an in-school investigation. The Superintendent of Schools concluded that Gordon had not acted with sexual intent but reprimanded Gordon for "inappropriate behavior." Although Gordon previously had received several merit recognitions and was a tenured teacher, he had received three reprimands for matters involving female students.[1]

---

[1] In 1974, Gordon received a written reprimand from the principal for driving female students without their parents' permission and for permitting female students to enter a darkened teachers' lounge.

In 1978, Gordon received a written reprimand from the principal following repeated cautioning for driving students to

Subsequently, in April 1993, a former student reported to the Fairfax County Police that Gordon had raped her in 1983 when she was a student at the school. As a result of that report, the school board suspended Gordon from teaching, effective April 30, 1993. On May 13, 1993, Gordon was arrested upon the former student's complaint. On May 14, 1993, the school's principal sent letters to the current students' parents informing them of Gordon's suspension and arrest and notifying them that extra counseling support would be available for interested students. In response, twenty-three students made varying allegations against Gordon of "improper touching." The DSS was not involved in Gordon's suspension or the related notification of parents. However, on May 17, 1993, the police notified the Child Protective Services (CPS) division of the Fairfax Department of Human Development of allegations of "improper touching" made by twenty-three students, and the CPS began an investigation.

On July 19, 1993, the CPS notified Gordon it was investigating the allegations of the twenty-three students. At all times, Gordon denied the charges. After a preliminary hearing in the Fairfax County Juvenile and Domestic Relations District Court on August 27, 1993, the rape charge made by the

---

various activities in the evenings and on weekends, frequenting places where students congregated, and showing favoritism toward certain students, especially females.

In 1984, Gordon received a written reprimand for transporting female sixth-graders in his car without parental permission.

former student was dismissed. The Commonwealth Attorney's office also decided not to pursue criminal charges for the allegations made by the twenty-three current students, but in accord with Code § 63.1-248.6, the CPS continued to investigate the complaints. By letters sent in September and October of 1993, the CPS notified Gordon of its determinations of "founded, level 1, sexual abuse" of five of the female students, varying in age between ten and twelve years. As required by the DSS's Policy Manual, these findings were reported to the Superintendent of Schools. The principal continued Gordon's suspension. Pursuant to Code § 63.1-248.6:1 and Virginia Regulation 615-45-2, Gordon requested an informal conference before the CPS Director. Following a conference on November 19, 1993, the Director's designee, Supervisor Thomas Hamblen, affirmed the CPS's findings in a two-page memorandum. He found the students were "reliable and trustworthy" in their statements to the investigators because the students had personal knowledge of the alleged incidents, were without malice toward Gordon and had no motive to fabricate their stories. None of the students were present at the informal conference.

Upon receipt of Hamblen's memorandum, pursuant to Code § 63.1-248.6:1, Gordon appealed to the DSS. At the DSS hearing, Gordon was permitted to introduce evidence, cross-examine the investigators, and challenge the reliability and trustworthiness of the statements that the five children had given to the CPS

investigators.  The five girls were not present and Gordon was not able to cross-examine them.[2]  The DSS hearing officer affirmed the CPS findings and investigative reports.  She specifically found that "clear and convincing evidence [showed] . . . [the students] were sexually abused by [Gordon], and [that] this resulted in or was likely to have resulted in serious harm to them."  Gordon appealed to the circuit court.

In a letter opinion, the trial court concluded that, although many errors were alleged, collectively they constituted only two, to-wit:  (1) insufficiency of the evidence and (2) deprivation of due process.  The court concluded that the record did not contain substantial evidence to support the five determinations of Level 1 abuse and, in fact, that it did not contain substantial evidence to support a finding of any level of sexual abuse against one of the students.  It also concluded that the DSS's bias, refusal to allow Gordon to cross-examine the complainants and notification of the school board violated Gordon's due process rights and that this violation could not be cured by remand.  Finally, it ordered the DSS to pay Gordon's attorney fees under Code § 9-6.14:21 because it found that Gordon had substantially prevailed on the merits and that the DSS had acted unreasonably.

The evidence, viewed in the light most favorable to the DSS,

---

[2]Two of the girls were present at a hearing before the school board and were cross-examined by Gordon's counsel at that time.

included testimony regarding the following conduct:  Student No. 1 was in Gordon's class in the fourth and fifth grades.  When she was in the fourth grade, Gordon hugged her, and in the fifth grade, on more than five or ten occasions, he put his arm around her and put his hand on her "butt [to] pat or squeeze it," which made her uncomfortable.  During her sixth grade year, he put his arm around her and touched her very close to her breast.  He sometimes whistled at her and told her she was pretty or cute.  On one occasion, he pulled her onto his lap and rocked back and forth while saying, "I love you."  She was sitting in his crotch area while he squeezed her with his legs and arms, and she could feel his penis on her buttocks.  Student No. 1 reported some of Gordon's behavior to the principal prior to the former student's April 1993 report to authorities, prompting the in-school investigation previously described.

Student No. 2 was Gordon's student and a member of the safety patrol.  On one occasion during her fifth grade year, while she was in Gordon's office on safety patrol business, Gordon came up very close behind her and rubbed her "butt."  She turned quickly to find Gordon only a few inches away from her with "a weird look on his face."  She said he "knew what he had done."  On another occasion, when she fell during class, Gordon picked her up with his hand on her crotch.

Student No. 3 was Gordon's student and a member of the safety patrol.  During her fifth grade year, Gordon often touched

her buttocks and hugged her. She was frequently excused from certain activities in gym class due to stomach problems, and while she waited for the other students to finish class, Gordon would approach her to talk about the safety patrol and would put his hand on her back, move it down to her buttocks, and rub and "cup" her "butt." This behavior occurred during almost every class from which she was excused, and it increased during her sixth grade year. It also occurred on several occasions when Gordon called her into his office to discuss safety patrol matters.

Student No. 4, Gordon's student and a member of the safety patrol, said Gordon "play[ed] around a lot" and rubbed "[her] butt a lot," at least five times. He patted her "butt" on other occasions. She also told the CPS investigators that she knew Gordon assaulted the former student who had complained to the police "because he did it to me."

Student No. 5, a sixth grader in a different instructor's physical education class, reported that Gordon hugged her on several occasions, which made her feel uncomfortable. On one occasion, he hugged her from behind with his hands "actually cupping her breasts," and she pulled away from him. Along with Student No. 1, Student No. 5 reported Gordon's behavior to the principal before the former student's report to the police.

## II.

### Sufficiency of the Evidence

In an appeal to the circuit court from a decision by an agency, the burden is upon the appealing party to demonstrate error.  See State Bd. of Health v. Godfrey, 223 Va. 423, 432-33, 290 S.E.2d 875, 879-80 (1982).  In a court's review of the sufficiency of the evidence to support the agency's decision, the determination of issues of fact must be made upon the agency record.  See Code § 9-6.14:17.  Thus, the circuit court's review of issues of fact is limited to the agency record.  See Godfrey, 223 Va. at 433, 290 S.E.2d at 880; see also Turner v. Jackson, 14 Va. App. 423, 430-31, 417 S.E.2d 881, 886 (1992).  Although the Court views the facts contained in that record most favorably to the DSS, that evidence must be substantial.  See J.P. v. Carter, 24 Va. App. 707, 720, 485 S.E.2d 162, 169 (1997) (quoting Code § 9-6.14:17).

At an administrative hearing held in accord with the APA, hearsay evidence is admissible.  See Code § 9-6.14:12.  If the agency relies on hearsay evidence, the court reviewing the sufficiency of that evidence on appeal may give it the same weight as any other record evidence.  "The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion."  See Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988).  Under the facts of this case, we hold the trial court improperly rejected the agency's findings and substituted its own.

> Code § 18.2-67.10 defines "sexual abuse" as
> an act committed with the intent to sexually
> molest, arouse, or gratify any person, where
> . . . [t]he accused intentionally touches the
> complaining witness's intimate parts or
> material directly covering such intimate
> parts; [or] . . . [t]he accused forces the
> complaining witness to touch the accused's
> . . . intimate parts or material directly
> covering such intimate parts . . . .

"Intimate parts" include "the genitalia, . . . breast, or buttocks of any person."  Id.

The guidelines in the DSS Protective Services Manual, promulgated to assist case workers in interpreting the relevant statutes, define sexual abuse to be investigated by the DSS as including "any act defined in [Code §§ 18.2-61 to -67.10 and §§ 18.2-351 to -371] which is committed . . . upon a child by . . . [a] person responsible for the child's care."  Manual, Virginia Department of Social Services:  Child Protective Services, vol. VII, § III, ch. A, at 8 (July 1992) (hereinafter "the Manual"); see also Jackson v. W., 14 Va. App. 391, 399, 419 S.E.2d 385, 389 (1992).  The Manual further defines sexual abuse to include "sexual contact (clothed/unclothed) between a caretaker and a child when such contact, touching or interaction is used for arousal or gratification of sexual needs or desires, including . . . [t]ouching . . . the child's genitalia, . . . breast or buttocks."  Id. at 9.

The DSS classifies such abuse by its seriousness.  See id. at 17d-18.  Level 1 abuse comprises "those injuries/conditions,

real or threatened[,] that result in or were likely to have resulted in serious harm to a child." Id. Such abuse includes "situation[s] . . . where there was genital contact, or force or threat was used, or the abuse had taken place over a period of time and there were multiple incidents." Id. at 17e. Level 2 abuse includes those injuries or conditions "that resulted in or were likely to result in moderate harm to a child," including "minimal or no physical touching but exposure to masturbation, exhibitionism," sexually provocative comments, pornographic materials or the like. Id. at 17e-17f. Level 3 abuse includes those injuries or conditions "that resulted in or were likely to result in minimal harm to a child." Id. at 17f. "On review, 'the interpretation an administrative agency gives its [law] must be accorded great deference.'" Jackson, 14 Va. App. at 400-01, 419 S.E.2d at 390 (quoting Virginia Real Estate Bd. v. Clay, 9 Va. App. 152, 159, 384 S.E.2d 622, 626 (1989)).

The trial court did not dispute that the evidence disclosed sexual abuse of four of the five children. Its decision appears to hold only that no substantial evidence proved serious harm to the children as required for a Level 1 finding. It also held the evidence was insufficient to support a finding of any level of abuse against Student No. 5 because it did not show that appellant acted with the requisite intent. We disagree and hold that the record contains substantial evidence to support the findings of the DSS that Gordon committed Level 1 sexual abuse

against three of the five students and Level 2 sexual abuse against the other two.

In its extensive opinion, the trial court stated that the "record in this case utterly lacks any evidence of the kind of serious harm or the likelihood of serious harm that would justify a level one finding." While being critical of the hearing officer's finding that the abuse Gordon inflicted on the children "is or was likely to have resulted in serious harm to [the children]," in its nineteen-page opinion, the trial court did not refer at any time to the testimony that Gordon "hugged" Student No. 1, put his hand on her "butt," patted or squeezed her "butt," and touched her close to her breast. Nor did it mention evidence that Gordon pulled her into his lap, held her, said "Oh, I love you," and rocked back and forth as she sat on his crotch area, while he squeezed her with his legs and became so aroused that she could feel his penis on her buttocks.

That conduct alone is sufficient to prove Gordon violated the DSS guidelines and Code § 18.2-67.10, which proscribe sexual abuse, and to permit the fact finder to conclude, as it did, that Gordon's acts were "likely to have resulted in serious harm to the child." Nothing in the DSS Manual or any of the code provisions the trial court cited requires proof that the injury to the child be permanent, only that it was "likely" to have resulted in serious harm. See Jackson, 14 Va. App. at 401-02, 419 S.E.2d at 391 (quoting Jenkins v. Winchester Dep't of Soc.

- 11 -

Servs., 12 Va. App. 1178, 1183, 409 S.E.2d 16, 19 (1991)) (rejecting argument that finding of abuse requires proof of actual harm). Therefore, as to Student No. 1, we hold that the evidence was sufficient to support the DSS finding of Level 1 sexual abuse and that the trial court failed to give deference to that finding.

But this case is not dependent only upon Gordon's abusive acts against Student No. 1. Substantial evidence proved that Gordon committed repeated acts of sexual abuse, as defined in Code § 18.2-67.10 and the guidelines, against Students No. 3 and 4, which supports the DSS finding that Gordon committed Level 1 sexual abuse against each of those students, as well. As noted earlier, a complaint of Level 1 abuse may be founded when the "abuse ha[s] taken place over a period of time and there were multiple incidents." The Manual, at 17e. Viewed in the light most favorable to the DSS, the evidence shows appellant repeatedly touched those students' buttocks or breasts with the necessary intent. Again, the trial court failed to give appropriate deference to the DSS's findings.

As to Students No. 2 and 5, the record contains substantial evidence that Gordon acted with the necessary intent toward each student on one occasion, thereby supporting a finding that appellant sexually abused each student as defined in Code § 18.2-67.10 and the DSS guidelines. As to Student No. 2, the evidence shows that Gordon came up very close behind her in his

office and rubbed her "butt." When she turned quickly, she found him only a few inches away from her with "a weird look on his face," and she said he "knew what he had done." As to Student No. 5, the evidence shows Gordon "actually cupp[ed] her breasts" with his hands, which also provides substantial evidence that he acted with the necessary intent. However, because Students No. 2 and 5 recounted only one incident each of sexual abuse, we conclude that the abuse in each case was Level 2 abuse rather than Level 1.

## Due Process

Gordon argues that the procedures followed by the CPS and DSS denied him due process under the Fourteenth Amendment to the United States Constitution and Article I, Section II, of the Virginia Constitution. The state and federal due process clauses "have [an] almost exact similarity in language" and, therefore, our analysis of the due process issue applies equally to both state and federal law. See Morris v. City of Danville, 579 F. Supp. 900, 901 n.1 (W.D. Va. 1984), cited with approval in Jackson, 14 Va. App. at 405 n.11, 419 S.E.2d at 393 n.11.

> The Fourteenth Amendment . . . provides that no person shall be deprived of life, liberty or property without due process of law. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Due process analysis involves a two-part inquiry. First, there must be a deprivation of a liberty or property interest. Then, "'[o]nce it is determined that due process applies, the question remains what process is due.'"

- 13 -

Jackson, 14 Va. App. at 405-06, 419 S.E.2d at 393-94 (citations and footnote omitted); see also J.P., 24 Va. App. at 715-16, 485 S.E.2d at 167.

Due process does not entitle an individual to "the full panoply of judicial procedures" when a governmental agency is engaged only in a general fact-finding investigation, see Hannah v. Larche, 363 U.S. 420, 442 (1960); however, if the process takes on a judicial role, the procedure used to arrive at a decision must satisfy due process. See Jackson, 14 Va. App. at 408, 419 S.E.2d at 395. Generally, in a child sexual abuse case such as this one,

> the department has the following duties: to investigate complaints; determine whether the complaint is "founded," "reason to suspect," or "unfounded"; place the name of a person with a "founded" complaint in the Central Registry; report its findings when required; make recommendations and arrange for services based on findings; and foster community-based outreach and educational programs. Code § 63.1-248.6. The hearing officer lacks the power to issue subpoenas or administer an oath. The officer has no authority to impose civil or criminal penalties or render a decision adjudging the party "guilty" or "not guilty." D'Alessio v. Lukhard, 5 Va. App. 404, 408, 363 S.E.2d 715, 717-18 (1988) (the administrative proceeding does not "determine . . . guilt or innocence"). In fact, if civil or criminal rights are to be adjudicated, a court must intervene upon appropriate process. Code § 63.1-248.6(D)(4), (5). The only direct consequence of the proceeding is that a party's name is placed in the Central Registry. See Lukhard, 5 Va. App. at 408, 363 S.E.2d at 717; see also Code § 63.1-248.6:1.

<u>Id.</u> at 407-08, 419 S.E.2d at 394-95.  There is no showing in this case that the foregoing procedures were not followed.  If Gordon was entitled to due process, he received all that he was due.

Regardless of the many errors alleged by Gordon, his basic complaint is that the agency "deprived" him of his teaching job with the Fairfax County school system.  The agency finding was made by a totally separate entity from the School Board and was limited to placing his name in the Central Registry.  The DSS had no power to and, in fact, did not "deprive" Gordon of his teaching position with the Fairfax County school system.  His separation from that school system was solely the act of the School Board.  In <u>Paul v. Davis</u>, 424 U.S. 693 (1976), the Court described the functions of the Commission on Civil Rights, a federal agency, in this language:

> "It does not adjudicate.  It does not hold trials or determine anyone's civil or criminal liability.  It does not issue orders.  Nor does it indict, punish, or impose any legal sanctions.  It does not make determinations depriving anyone of his life, liberty or property.  In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights.  The only purpose of its existence is to find facts which may subsequently be used as a basis for legislative or executive action."

<u>Paul</u>, 424 U.S. at 706 n.4 (quoting <u>Hannah</u>, 363 U.S. at 441).

Even if the School Board's act was a "'collateral consequence'" flowing from the investigation and finding of the DSS, it would not affect the legitimacy of the DSS investigative

function.  See id. (quoting Hannah, 363 U.S. at 443).  Gordon has been deprived of no Fourteenth Amendment guarantee.  While Gordon had a liberty interest in pursuing his vocation as a teacher, he was not deprived of that right by the DSS.  Gordon was removed from his teaching position by the School Board, not by the DSS, which had no authority to force the Board to do anything.  See id.; see also Billing v. City of Norfolk, 848 F. Supp. 630, 635 (E.D. Va. 1994).  Cf. Jackson, 14 Va. App. at 410, 419 S.E.2d at 396 (rejecting claim that DSS proceeding may serve as predicate for criminal prosecution because Commonwealth, not DSS, must bring criminal charges).  Furthermore, even if the DSS's filing of its findings with the Central Registry had the collateral consequence of moving the Board to take the action it did, the School Board's action would not be because of any affirmative act taken by the DSS.  See Paul, 424 U.S. at 706 n.4 (citing Hannah, 363 U.S. at 443).

Finally, Gordon's speculation about other possible adverse consequences from the determinations is just that--speculation. "Although a 'founded' disposition could possibly foreclose [Gordon's] chances for engaging in [teaching or other] activities," Gordon has pointed to "no rule . . . that a 'founded' disposition of child abuse automatically disqualifies an applicant" from such activity.  Jackson, 14 Va. App. at 410, 419 S.E.2d at 396; see Turner, 14 Va. App. at 437, 417 S.E.2d at 890-91 ("founded" disposition does not give DSS power to order

change in child custody or terminate parental rights). Therefore, Gordon has not identified a deprivation cognizable under the Due Process Clause.

Because Gordon has been given all the process he is due, and substantial evidence in the record supports the DSS decision, we hold that, considering the record as a whole, a reasonable mind would not <u>necessarily</u> come to a different conclusion.  <u>See</u> <u>Kenley</u>, 6 Va. App. at 242, 369 S.E.2d at 7.  For these reasons, we affirm the finding of the DSS and reverse the judgment of the trial court with respect to its finding of no Level 1 sexual abuse against Students No. 1, 3 and 4.  As to Students No. 2 and 5, we hold that substantial evidence did not prove Level 1 abuse but did prove Level 2 abuse.  Further, we hold that Gordon was not deprived of any due process right guaranteed by the United States or Virginia Constitutions.  Finally, because Gordon did not "substantially prevail[] on the merits" and we find no evidence that the DSS "acted unreasonably," we reverse the award of attorney fees under Code § 9-6.14:21[3] and remand this case to the trial court for entry of an order consistent with this opinion.

<u>Reversed and remanded.</u>

----

[3]We do not decide whether Code § 9-6.14:21 would have permitted such an award if Gordon had substantially prevailed and the DSS had acted unreasonably.