COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Senior Judge Coleman
Argued at Chesapeake, Virginia


GARY WAYNE ABLES

                                    MEMORANDUM OPINION[*] BY
v.     Record No. 0973-02-1        JUDGE SAM W. COLEMAN III
                                        FEBRUARY 19, 2003
SONIA RIVERO, COMMISSIONER,
 VIRGINIA DEPARTMENT OF SOCIAL SERVICES


             FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                       Bruce H. Kushner, Judge

            Catherine L. MacLean (John J. Flora, III;
            Bennett and Zydron, P.C., on brief), for
            appellant.

            Cheryl A. Wilkerson, Assistant Attorney
            General (Jerry W. Kilgore, Attorney General;
            Francis S. Ferguson, Deputy Attorney General;
            Siran S. Faulders, Senior Assistant Attorney
            General; A. Cameron O'Brion, Assistant
            Attorney General, on brief), for appellee.


     Gary Wayne Ables appeals a decision of the trial court

affirming a disposition of founded child abuse by the Virginia

Department of Social Services (DSS).  Ables contends the finding

that he committed child abuse is fundamentally unfair and that he

was denied due process during the proceedings.  He also asserts

that the trial court erred by failing to find that the disposition

was not in accordance with constitutional right, power, privilege,

or immunity.  In addition, Ables argues that the statutes,

        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

regulations, and polices applied in determining physical abuse in this case are void for vagueness.  Finding no error, we affirm.

BACKGROUND

Ables is the stepfather of the teenage child, who was fourteen years old at the time of the incident.  On May 27, 1999, the teenage child showed signs of discomfort when sitting in her school classes.  She reported that Ables had spanked her on the buttocks with a board or paddle more than once a day for the past several days as punishment for various incidents of misbehavior and poor progress reports from school.  A Child Protective Services worker (CPS worker) interviewed the teenage child that day at her junior high school.  In her intake assessment, the CPS worker reported that the teenage child's buttocks "were almost a solid bruise."  Some of the marks appeared red and fresh, while others appeared "darker blue" and "yellowish," indicating a "different stage of marks."  The intake assessment indicates that the school nurse observed the teenage child's injury and declared that it was "one of the worst bruising situations she had seen in all her years of nursing."  The teenage child did not receive medical treatment for the injury.

The teenage child told the CPS worker that Ables had spanked her seven times in the past three and one-half days and that Ables indicated he would continue the beatings every day until she received a good progress report.  The teenage child estimated that

-

Ables struck her twelve times on the preceding day.  The teenage child also stated that Ables used a "paddle-type board" when he struck her.  She described it as being about two feet long and several inches thick.  The teenage child told the CPS worker that she once wore several layers of undergarments in anticipation of the beating.  The CPS worker indicated the extra clothing did not appear to lessen the intensity of the blows.  The teenage child also advised the CPS worker of a similar beating that had occurred in the previous year in which Ables struck her and caused bruising.

The CPS worker interviewed Ables at the family home on the same day she interviewed the teenage child.  He admitted that he had spanked the teenage child approximately six times in the past week.  He also agreed that he used a "paddle," but he was unable to locate the paddle to show the CPS worker.  Ables and his wife, the teenage child's mother, explained that the teenage child was disciplined for various incidents of misbehavior and for her poor performance in school.  They indicated that they believed similar discipline had been effective in the past.  The CPS worker expressed concern in her report that the parents did not "see the severity of their actions and [they felt] that [the teenage child], by her own actions, brought them to this point of excessive discipline."

-

The CPS worker also noted that Ables is "a very well built strong individual," with a handshake of "tremendous strength." The record indicates that Ables is six feet, two inches tall and weighs 280 pounds.

The CPS worker met with her supervisor and co-workers on June 30, 1999, to review and consider the case. The staff made a disposition of founded for physical abuse based on the severity of the injuries and the numerous times Ables struck the teenage child over a time period of several days. By letter dated July 7, 1999, Child Protective Services informed Ables that, based upon its investigation of the matter, it "ha[d] made a disposition of Founded case of physical abuse of [the teenage child] by . . . Ables." The letter further advised Ables this was a Level I disposition "in that the abuse resulted, or was likely to have resulted, in severe harm to the child." The letter also stated that, as a result of the action taken by DSS, Ables' name had been reported to the Central Registry.

Ables appealed the decision of Child Protective Services to a local agency "conference" on August 11, 2000, where he was represented by counsel. Ables presented evidence at the conference, including a paint stirrer that he described as being "similar" to the paddle he used to strike the teenage child. Ables described the teenage child's misbehavior which he felt justified the punishment. He indicated that he had not intended

-

to cause the bruising and had intended only to discipline the teenage child. Ables also stated that he had spanked the teenage child once a day for four days in a row, whereas he had earlier stated to the CPS worker that he paddled her six times in that time frame.[1]

By letter dated August 21, 2000, the Chief of Services for Chesapeake DSS advised Ables that the disposition of founded abuse was upheld. However, she amended the Level I finding to a Level II finding, which includes "'those injuries/conditions, real or threatened, that result in or were likely to have resulted in moderate harm to a child.'" The letter further set forth the definition of "physical abuse" that is found in the DSS regulations and stated that "bruising" is considered a physical injury within the meaning of physical abuse. The letter advised Ables that his name was being forwarded to the Central Registry where it would be retained for a period of seven years.

Ables appealed the local agency decision to the Commissioner of DSS. On December 1, 2000, an administrative hearing before a hearing officer was conducted by telephone conference call. Both

_____

[1] The record contains a court order from the Chesapeake Juvenile and Domestic Relations District Court which addresses the custody of the teenage child and was entered on July 21, 2000. Ables signed this order, which states that Ables "had spanked" the teenage child with a paddle "twice a day over the course of several days."

Ables and the CPS worker testified and cross-examined each other. At the request of both parties, the administrative record was held open until January 19, 2001 to allow for the submission of additional evidence. At the hearing, appellant again acknowledged that he struck the teenage child with a paddle for several days, resulting in the bruising. Ables argued that his actions were not malicious and were intended as discipline.

In her decision, the hearing officer wrote:

> Regardless of the intent of [Ables'] actions in spanking [the teenage child] with the paddle, he undertook a volitional act by repeatedly spanking her, which resulted in severe injuries to her buttocks. [Ables] is, as described by the worker, a large man. The bruises covering [the teenage child]'s buttocks were inflicted through her jeans and, for at least some of the paddlings, through several pairs of underwear. Afterwards, [the teenage child] was uncomfortable and had difficulty trying to sit down at school. After viewing the bruises in the photographs, there can be no question that these injuries were painful and that a great deal of force was used by [Ables] when he paddled the child. Clearly, [Ables'] behavior crossed the line from discipline to physical abuse when he hit [the teenage child] with the paddle repeatedly over several days and with sufficient force to cause such severe bruising through her clothing.

The hearing officer sustained the disposition of "Founded-Physical Abuse-Level 2," and Ables appealed the decision to the circuit court.

-

The circuit court's written statement of facts states that the parties appeared before the court on two occasions.  Neither hearing was transcribed.  Ables argued to the trial court that because his name has been placed in the Central Registry, he is prohibited from coaching his son in volunteer sporting activities.  He also filed a petition for review and appeal in which he presented constitutional arguments.  The trial court affirmed the hearing officer's decision.  By order dated March 21, 2002, the trial court held that the procedures used by DSS "did not constitute a constitutional deprivation;" the agency record contained substantial evidence to support the factual findings; "the evidence in the agency record reached a clear and convincing level of proof;" and Ables' corporal punishment "went beyond the 'bounds of moderation and reason.'"

ANALYSIS

1.  Standard of Review

"In an appeal to the circuit court from a decision by an agency, the burden is upon the appealing party to demonstrate error."  Carter v. Gordon, 28 Va. App. 133, 141, 502 S.E.2d 697, 700-01 (1998).  The evidence is viewed in the light most favorable to DSS, and the "court's review of issues of fact is limited to the agency record."  Id. at 141, 502 S.E.2d at 701.  The Administrative Process Act provides that "the duty of the court with respect to issues of fact is limited to ascertaining

-

whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Former Code § 9-6.14:17 (re-codified as Code § 2.2-4027).

> The "substantial evidence" standard, adopted by the General Assembly, is designed to give great stability and finality to the fact-findings of an administrative agency. The phrase "substantial evidence" refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Under this standard, applicable here, the court may reject the agency's findings of fact "only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion."

Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) (citations omitted) (emphasis in original).

## 2. Whether the Finding was Fundamentally Fair

Ables contends that the administrative procedures followed by DSS in making its disposition and in its appellate process denied him the opportunity to have an impartial trier of fact. However, this Court has held that the administrative procedures adopted by DSS are constitutional even where a protected liberty or property interest exists. Jackson v. W., 14 Va. App. 391, 405-12, 419 S.E.2d 385, 393-98 (1992).

> [T]he government has an important interest in preventing child abuse and neglect. Considering the value of additional

-

procedures in reducing the risk of an erroneous deprivation, we are mindful that the department's initial determination was subject to two appeal proceedings. [The accused] was given notice and an opportunity to be heard. Moreover, the burden on the Commonwealth, in terms of administrative efficiency and financial cost, of requiring additional procedural requirements is significant. As a practical matter, permitting witnesses appearing before the department to enjoy the rights that typically pertain in adjudicatory proceedings would have adverse identifiable consequences. The primary function of the department is to investigate complaints of child abuse and neglect. The Supreme Court has warned that "the investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings." Indeed, requiring the department to provide "the full panoply" of procedures normally associated with an adjudication would severely undermine the fact-finding duties of the agency. Consequently, the challenged procedures are constitutionally adequate even were it to be assumed that [the accused] has a protected liberty or property interest under the Due Process Clause.

Id. at 412, 419 S.E.2d at 397 (quoting Hannah v. Larche, 363 U.S. 420, 443 (1960)).[2]

The CPS worker interviewed Ables on the day the teenage child reported the incident. Ables cooperated in the initial investigation by speaking with the worker. Ables then appealed

---

[2] In his brief, Ables asserts that Hannah has been overruled. Although the case has been distinguished and criticized in some respects over the years, the United States Supreme Court has not overruled the case.

-

the finding of abuse by Child Protective Services, and he participated in a conference at the local agency. He was represented by counsel at the proceeding where he presented evidence and argument. Ables appealed the decision of the local agency to the Commissioner of DSS and had a hearing before a hearing officer wherein he was again represented by counsel, presented evidence and argument, and had the opportunity to cross-examine adult witnesses. DSS kept the record open in order to allow Ables to present additional evidence. Ables then appealed the hearing officer's decision to the circuit court where he filed written arguments and made two appearances in court.

"If [Ables] was entitled to due process, he received all that he was due." Carter, 28 Va. App. at 146, 502 S.E.2d at 703. Furthermore, Ables has presented no evidence tending to show "that the fact-finding procedure was tainted by unfair prejudice or animosity." State Bd. of Health v. Godfrey, 223 Va. 423, 434, 290 S.E.2d 875, 881 (1982). Accordingly, Ables was not denied due process on this ground.

### 3.  Procedural Due Process

Ables contends he was denied procedural due process. He asserts that the disposition of founded physical abuse has deprived him of two liberty interests, the estrangement of the teenage child from the family and his alleged prohibition from

-

coaching his son's athletic teams.  He also asserts that he

suffers a stigma associated with being placed in the Central

Registry.

> The Fourteenth Amendment to the United
> States Constitution provides that no person
> shall be deprived of life, liberty or
> property without due process of law.
> "Procedural due process rules are meant to
> protect persons not from the deprivation,
> but from the mistaken or unjustified
> deprivation of life, liberty, or property."
> Due process analysis involves a two-part
> inquiry.  First, there must be a deprivation
> of a liberty or property interest.  Then,
> "'[o]nce it is determined that due process
> applies, the question remains what process
> is due.'"

Jackson, 14 Va. App. at 405-06, 419 S.E.2d 393-94 (citations and

footnote omitted).

We find that DSS did not deprive Ables of any liberty

interests without due process of law.  In Jackson, the accused

alleged, among other things, that the founded disposition would

damage his dental practice and his reputation.  Id. at 409, 419

S.E.2d at 396.  We held that the record lacked any evidence of

damage to the accused's dental practice and that no likelihood

existed that information from the Central Registry would become

available to the accused's patients because the information in

the registry is confidential.  Id.  "[T]he statute provides for

the confidentiality of all records or files compiled during the

investigation, Code § 63.1-248.7(J), and the data stored in the

-

computerized Central Registry, Code § 63.1-248.8. Therefore, information concerning [Ables'] abusive conduct is not generally available to the public." Id. at 409-10 n.14, 419 S.E.2d at 396 n.14.

Furthermore, the Court held that "a person's reputation alone is not a liberty or property interest and thus is not entitled to due process protection." Id. at 411, 419 S.E.2d at 396. Thus, Ables' argument that he will suffer a "stigma" is not an interest entitled to due process protection. Moreover, the purpose of the Child Abuse and Neglect Act is "not one of punishment and correction of the alleged abuser. Rather, under this statute, the policy of protecting abused children and preventing further abuse of those children is key." J.P. v. Carter, 24 Va. App. 707, 726, 485 S.E.2d 162, 172 (1997).

In Carter v. Gordon, Gordon complained that the "founded" disposition deprived him of his teaching job where he had been suspended by the school from that job. Carter, 28 Va. App. at 146, 502 S.E.2d at 703. The Court held that the DSS finding "was limited to placing his name in the Central Registry," and DSS had no power to "deprive" Gordon of a teaching job. Id. at 146, 502 S.E.2d at 703. Rather, "his separation from that school system was solely the act of the School Board." Id.

Here, Ables offered no evidence that he has been deprived of the opportunity to coach his son. Indeed, the regulation he

-

cites as authority for the proposition that the disposition will deprive him of the coaching opportunity addressed "Minimum Standards for Local Agency Operated Volunteer Respite Child Care Programs." 22 VAC 40-790-20 (now repealed). However, even if, as a "collateral consequence" of being in the Central Registry, he is deprived of a coaching opportunity, it would not be as a result of the action of DSS, whose power is limited to placing his name in the Central Registry. Carter, 28 Va. App. at 147, 502 S.E.2d at 704. Rather, Ables' lack of opportunity to coach would be solely the result of an act or decision of the applicable league or athletic body. "'Although a "founded" disposition could possibly foreclose [Ables'] chances for engaging in [coaching] activities,' [Ables] has pointed to 'no rule . . . that a "founded" disposition of child abuse automatically disqualifies an applicant' from such activity." Id. (citation omitted).

Ables asserts that the teenage child is estranged from the family as a result of the procedures of DSS and that interference with his familial relationship is a deprivation of his liberty interest entitling him to due process. However, the "only immediate consequence of the disposition is the placement of [Ables'] name and the [teenage child's name] in the computerized Central registry. The placement of [Ables'] name in the Central Registry does not interfere with his relationship

-

with [the teenage child]."  Turner v. Jackson, 14 Va. App. 423, 437, 417 S.E.2d 881, 891 (1992) (citation omitted).

Therefore, Ables "has not identified a deprivation cognizable under the Due Process Clause."  Carter, 28 Va. App. at 147, 502 S.E.2d at 704.

#### 4.  Right to Administer Corporal Punishment

Ables asserts that DSS failed to consider that he had a legal responsibility and duty to control the teenage child, and he had a parental right to administer corporal punishment to maintain that control.  He also contends "there was no attention paid to the behavior" of the teenage child which led to the punishment.

First, we note that the record shows Ables repeatedly expressed his opinion to the CPS worker, and at every stage during the proceedings, that the teenage child's behavioral issues justified his "disciplinary" actions.  However, even taking into consideration that the teenage child may have had behavioral issues, parental punishment may not exceed the bounds of reason.

> Courts are agreed that a parent has the right to administer such reasonable and timely punishment as may be necessary to correct faults in his growing children.  The right cannot be used as a cloak for the exercise of malevolence or the exhibition of uncontrolled passion on the part of the parent.

-

Carpenter v. Commonwealth, 186 Va. 851, 860, 44 S.E.2d 419, 423 (1947) (involving a criminal charge for assault and battery of a seven-year-old child). "[T]he great preponderance of authority is to the effect that a parent has a right to punish a child within the bounds of moderation and reason, so long as he does it for the welfare of the child; but that if he exceeds due moderation, he becomes criminally liable." Id. at 861, 44 S.E.2d at 423.

"[W]here the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 244, 369 S.E.2d 1, 8 (1988). "The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." Id. at 242, 369 S.E.2d at 7.

Substantial evidence, including the photographs showing the teenage child's bruising, supported the hearing officer's finding that Ables' actions "crossed the line from discipline to physical abuse." Ables intentionally struck the teenage child repeatedly with a board or paddle, on the outside of her clothing, twice a day, over a period of several days, causing severe bruising that covered the teenage child's entire buttocks

-

and caused the teenage child discomfort.  Clearly, this punishment "'went beyond the bounds of moderation and reason'" as stated by the trial court.  See State v. Arnold, 543 N.W.2d 600, 603 (Iowa 1996) (criminal case finding abuse where beating caused bruised buttocks on child); Miller v. Walker, 665 A.2d 1252, 1256-57 (Pa. Super. Ct. 1995) (one incident of spanking with board causing bruising and pain considered "bodily injury" within meaning of Protection from Abuse Act); In re F.P., 665 A.2d 597, 602 (Vt. 1995) (pain and bruising caused by striking with hand and belt sufficient to justify conclusion that parent did not reasonably discipline, but unreasonably abused child).

In addition, "physical abuse" is defined in 22 VAC 40-705-30 as:  "When a caretaker creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon a child a physical injury by other than accidental means or creates a substantial risk of death, disfigurement, or impairment of bodily functions."  The Virginia Department of Social Services, Child Protective Services Manual (CPS Manual) lists bruises as one of the categories of physical abuse. Virginia Department of Social Services, Child Protective Services, Vol. VII, Sec. III, Chap. A at 10 (1998).

Thus, regardless of the teenage child's alleged misconduct, or whether Ables did not intend to cause bruising with the beatings, the evidence showed that Ables intentionally and

-

repeatedly struck the teenage child's buttocks several times a day with a paddle or board. Therefore, Ables intended to strike the teenage child, and his striking caused bruising and discomfort. The result of his actions was not "unforeseen or unexpected." Accordingly, substantial evidence supported the finding of DSS that the injury was not accidental and constituted physical abuse.

### 5. Void for Vagueness

Ables contends the definition of abuse found in former Code § 63.1-248.1[3] is vague because it does not incorporate the constitutional right of a parent to "manage" or discipline a child.

"The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982). "The [United States Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id. at 498-99 (footnote omitted).

---

[3] The Child Abuse and Neglect statutes were revised and re-codified in 2002 in Code § 63.2-1501 et seq.

-

This Court previously addressed a similar challenge to Code § 63.1-248.1 and the guidelines, and we held that they are not unconstitutionally vague insofar as they define "physical abuse."  Turner, 14 Va. App. at 432-36, 417 S.E.2d at 888-90.

> "Essentially, the vagueness doctrine demands that laws be drawn with a degree of precision and clarity."  A law must "clearly delineate" what conduct is prohibited in order to "'give the person of ordinary intelligence a reasonable opportunity'" to conform his conduct accordingly, and to prevent arbitrary and discriminatory enforcement.  Although absolute precision is not required, a law must afford a reasonable degree of certainty so that a person is not left to guess at what conduct is prohibited.

Id. at 433, 417 S.E.2d at 888 (citations omitted).

Code § 63.1-248.2(A)(1) defines an "abused or neglected child" as any child under eighteen years of age:

> Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement, or impairment of bodily or mental functions.

The Turner Court held that the "physical injury" language "puts the average person on notice that conduct that creates or inflicts physical harm upon the child falls within the statute's proscription."  Turner, 14 Va. App. at 433-34, 417 S.E.2d at 888.  As in Turner, we find that a person of average intelligence would understand that beating the buttocks of a

-

teenager with a paddle or board of the size being utilized twice a day over a period of several days would result in physical injury to the teenager.

Furthermore, the hearing officer amended the original disposition to a Level 2 founded abuse, which is defined as including "those injuries/conditions, real or threatened, that result in or were likely to have resulted in moderate harm to a child." CPS Manual, Vol. VII, Sec. III, Chap. A at 113. The CPS Manual further provides that injuries that resulted in moderate harm include, in the case of physical abuse, "use of a tool which is associated with discipline such as a switch or paddle." Id. Clearly, this language would put the average person on notice that Ables' conduct fell within its proscription.

Our holding is in accord with those of other jurisdictions that have considered void-for-vagueness challenges involving similar statutory language. In Keser v. State, 706 P.2d 263 (Wyo. 1985), a stepparent was convicted of criminal child abuse. The accused struck the child with a metal spatula, with his hand, and with a belt on the child's bare buttocks about fourteen times. The child suffered bruising on his "posterior." The statute in effect at the time stated: "[A]ny adult who intentionally or in reckless disregard of the consequences causes physical injury . . . to a child . . . is guilty of child

-

abuse."  Wyo. Stat. Ann. § 6-2-503 (1977, now revised).  The accused argued that the term "physical injury" was vague because the statute did not define the term.

The Wyoming court concluded that "[p]hysical injury is harm to the body.  It is a term of common usage generally understood by the average person.  It includes bruises and welts and trauma of the kind suffered by the victim in this case."  Id. at 268.  The court stated:

> [The accused] should have known that his conduct was violative of the statute; and, if the definition of child abuse is not as precise as he would like it, that, in itself, does not render the statute unconstitutional.  The right to have children does not include a corresponding right to abuse them by omission or commission.  Children need protection.  This statute accomplishes that purpose and is sufficiently definite to satisfy constitutional requirements.

Id.

The Court also noted that, in upholding the constitutionality of a child neglect statute, a California court wrote, "'The type of conduct which . . . the statute seeks to reach defies precise definition.  In number and kind the situations where a child's life or health may be imperiled are infinite.'"  Id. at 267 (quoting People v. Beaugez, 43 Cal. Rptr. 28, 32 (Cal. Ct. App. 1965)).

-

In upholding the constitutionality of a criminal child cruelty and neglect statute in a case involving a bruised child, the Court of Appeals of Indiana stated, "[V]iolence sufficient to produce severe bruises is enough to allow an ordinary man to test the 'unnecessary' nature of the punishment inflicted.  The statute need only inform the individual of the generally proscribed conduct, it need not list with itemized exactitude each item of conduct prohibited."  Hunter v. State, 360 N.E.2d 588, 595 (Ind. App. 1977).  See also Watso v. Colorado Dep't of Soc. Servs, 841 P.2d 299, 310 (Col. 1992) ("Generality is not the equivalent of vagueness."); Chambers v. State, 364 So. 2d 416 (Ala. Crim. App. 1978) ("willful abuse" and "torture" are not so vague as to render criminal statute void for vagueness).

Ables also contends the definition of "founded" in the Administrative Code is vague because different sections of the Code and the CPS Manual define the term incongruously concerning the standard of proof necessary to make a disposition of founded.

At the time of the incident, May 1999, Title 22 of the Virginia Administrative Code contained two chapters addressing Child Protective Services that were then in effect.  Chapter 710, entitled "Child Protective Services Client Appeals," was effective on December 6, 1989 and was repealed, effective December 8, 1999.  Chapter 705, entitled "Child Protective

-

Services," became effective on January 1, 1998.  This chapter included a section on appeals.  Both of these chapters were in effect in May 1999.

The chapters contain different standards of proof for a disposition of "founded" child abuse.  Chapter 705, currently in effect, provides that "founded" "means that a review of the facts shows by a preponderance of the evidence that child abuse and/or neglect has occurred."  22 VAC 40-705-10.  Chapter 710, now repealed, provided that "founded" "means that a review of the facts shows clear and convincing evidence that child abuse or neglect has occurred."  22 VAC 40-710-10.

On July 19, 1999, Volume 15, Issue 22 of the Virginia Register of Regulations contained a proposed regulation repealing 22 VAC 40-710-10 et seq., effective on December 8, 1999.  The basis for the proposed regulation provided:  "The department proposes to repeal the original appeal regulation, 22 VAC 40-710-10 et seq., because it is part of a broader and more recent regulation, 22 VAC 40-705-10 et seq., which combines both programmatic and appeals regulations."  15 Va. Regs. Reg. Issue 22 at 2833 (July 19, 1999).  "The purpose of repealing the regulation is to eliminate a redundant regulation."  Id. Chapter 710 was repealed, effective December 8, 1999.  22 VAC 40-710-10 (Cum. Supp. 2002).

-

We conclude that this regulatory history shows that any inconsistency between the two chapters reflected an oversight by DSS in failing to timely recognize that the enactment of Chapter 705 was redundant with Chapter 710. In other words, DSS intended that the more recently-enacted provision, Chapter 705, applied at the time of this offense. In addition, the CPS Manual provided that "'founded' means that a review of the facts shows by a preponderance of the evidence that child abuse . . . had occurred." CPS Manual Vol. VII, Sec. III, Chap. A at 108 (citing 22 VAC 40-705-10). The CPS Manual also provided that when an accused appeals the decision of the local conference to the commissioner, "the local department shall have the burden to show that the preponderance of the evidence supports the founded disposition." Id. at 255 (citing 22 VAC 40-705-190(H)(9)).

Therefore, in accordance with 22 VAC 40-705-10 and the CPS Manual, the hearing officer used the correct standard of proof in her determination that the facts showed by a preponderance of the evidence that Ables physically abused the teenage child. Accordingly, we find that the regulations and policies were not so vague as to render them unconstitutional and the hearing officer used the proper standard of proof.

Moreover, we note that in the trial court's final order, affirming the hearing officer's decision, the court stated, "the evidence in the agency record reached a clear and convincing

-

level of proof."  "Clear and convincing proof is a higher standard of proof than that required under a preponderance standard."  Turner, 14 Va. App. at 428, 417 S.E.2d at 885. Thus, even under the higher standard of proof, the trial court found that the record contained substantial evidence upon which DSS could make a disposition of founded child abuse.

For these reasons, the judgment of the trial court is affirmed.

Affirmed.